# WILLIE LLOYD TURNER

## V.

# COMMONWEALTH OF VIRGINIA

Record No. 870554

January 15, 1988

Present: All the Justices

*J. Lloyd Snook, III* for appellant.

*Robert H. Anderson, III, Assistant Attorney General (Mary Sue Terry, Attorney General*, on brief), for apppellee.

CARRICO, C.J., delivered the opinion of the Court.

On November 26, 1980, this Court approved the conviction and death sentence of Willie Lloyd Turner for the murder during armed robbery of the proprietor of a jewelry store. *Turner* v. *Commonwealth*, 221 Va. 513, 273 S.E.2d 36 (1980) (*Turner I*). The Supreme Court of the United States denied certiorari. *Turner* v. *Virginia*, 451 U.S. 1011 (1981).

Subsequent habeas corpus proceedings brought by Turner proved unsuccessful until his habeas appeal reached the Supreme Court. On April 30, 1986, that Court overturned Turner's death sentence, but not his conviction, for the trial court's failure to question prospective jurors about possible bias resulting from the fact that Turner was black and his victim white. *Turner* v. *Murray*, 476 U.S. 28 (1986). The Court remanded the case for further proceedings, and the matter was ultimately returned to the trial court in Southampton County for a new sentencing hearing.

Upon return of the case, the trial court ordered a change of venue to Prince Edward County. In January 1987, a jury drawn from that county heard evidence on the issue of punishment and returned a verdict fixing Turner's sentence at death, based upon the "vileness" predicate established by Code § 19.2-264.2.[1] Following receipt of the report of a probation officer, the trial court imposed the death sentence upon Turner. He is here for automatic review of his sentence, as required by Code § 17-110.1.

---

[1] Although Turner had a record of serious crimes of violence and the trial court's instructions included the "dangerousness" predicate, the jury did not base the sentence of death upon that predicate.

Because the jury based its sentence solely upon the "vileness" predicate, we will recite only the evidence relating to that predicate. The murder in question occurred about 11:30 a.m. on July 12, 1978, at the store of Smith Jewelers in the City of Franklin. Turner entered the store carrying a sawed-off shotgun concealed under a green towel. Brandishing the gun, he forced several customers to line up against a counter and "motioned" the proprietor, W. Jack Smith, Jr., to place money and jewelry in bags. Smith complied, but surreptitiously activated a silent alarm to police headquarters.

Answering the call, Officer Alan D. Bain, Jr., entered the store and announced to Smith that his "alarm was on." In response, Turner pointed his shotgun "right at [Bain's] face" and directed the officer to remove his revolver from its holster and place it on the floor. When Bain complied, Turner picked up the weapon and put it in his pocket. Again brandishing the shotgun, Turner ordered Smith to turn off the alarm and to fill more bags with jewelry.

When the telephone rang, Turner directed a customer to answer it and held his shotgun "six to eight inches from [her] ear." Then, removing Bain's revolver from his pocket, Turner fired a shot toward the rear of the store and announced that "if he saw or heard any more police officers he was going to start killing." At that time, Bain heard "a siren go off." Turner then walked over to the counter where Smith was standing and "just pointed [Bain's revolver] and fired." Smith fell to the floor, bleeding from a wound to his head.

Bain remonstrated with Turner not to shoot anyone else and "offered to take him out of the store [and] to carry the stuff and take him anywhere he wanted to go." Turner said that he "wasn't going to hurt [Bain]" but that he was "going to kill [Smith] for snitching on [him]." As Smith lay "gurgling" on the floor behind the counter, Turner "reached over the counter," pointed Bain's revolver at Smith, and fired twice into his chest. Smith "jumped" as he was shot and did not move "any more after that." Bain then disarmed Turner and held him at bay until help arrived.

Medical testimony showed that Smith died from the bullet wounds to his chest, either one of which would have been fatal independently. While the wound to the head was not sufficient by itself to cause death, it did produce "bleeding on the coverings of the brain" and bruising of "the brain surface."

## JURY SELECTION

Before the sentencing hearing began, the prosecution and the defense agreed that prospective jurors should be advised that Turner had been sentenced to death previously for Smith's murder. The court so advised the prospective jurors and cautioned them that Turner's prior sentence should not "affect [the] verdict in this case."

When prospective juror Samuel Lambert was examined individually on voir dire, Turner moved to strike him for cause on the ground his responses indicated that knowledge of the prior death sentence would "affect his deliberations" in the present case. The trial court denied the motion.

Turner cites the following exchange between Lambert and defense counsel:

> MR. SNOOK [defense counsel]: Now the Judge . . . told you that Mr. Turner had been sentenced to death one time in an earlier trial . . . . How are you going to feel about knowing that he'd been sentenced to death once before?
>
> JUROR LAMBERT: Well, it wouldn't make me feel good about it.
>
> . . . .
>
> MR. SNOOK: Could you really put it out of your mind?
>
> JUROR LAMBERT: Well, I don't know about that. That's a hard thing.
>
> MR. SNOOK: Do you think it might continue to affect you?
>
> JUROR LAMBERT: Probably will.
>
> . . . .
>
> MR. SNOOK: You say you think you can [put everything else aside and base your sentence on what you hear in this courtroom?] You have some doubt about that?
>
> JUROR LAMBERT: Well . . . . [a]fter . . . you hear the lawyers and I guess that's what I think about.
>
> MR. SNOOK: [I]f you're going to continue to think about what happened in that other trial and if that might still affect your decision, then . . . we need to have you be honest with us and tell us that.
>
> JUROR LAMBERT: Well, it might affect me . . . . You know, I'll be thinking about it, I guess.

MR. SNOOK: And so the Judge would tell you that you're not supposed to do that but you think you might anyway[?]

JUROR LAMBERT: Well, I might.

MR. SNOOK: Do you think you probably would [let it affect you?]

JUROR LAMBERT: Well, I would think so.

MR. SNOOK: You probably would be thinking about it?

JUROR LAMBERT: Probably would be thinking about it.

Turner argues that the foregoing exchange shows Lambert "could not unequivocally state that he could put aside . . . knowledge" of Turner's prior death sentence. Hence, Turner concludes, he was deprived of a jury "able to 'stand indifferent in the cause.' "

■ We disagree with Turner. While the foregoing excerpt from Lambert's voir dire examination might tend to indicate some doubt concerning this prospective juror's objectivity, we must view the voir dire as a whole, rather than in isolated parts. *See Pruett v. Commonwealth*, 232 Va. 266, 281, 351 S.E.2d 1, 10 (1986), *cert. denied*, 482 U.S. ___, 107 S.Ct. 3220 (1987). When the examination of Lambert is so viewed, any doubt about his impartiality is removed.

Other parts of Lambert's voir dire show that he felt the death penalty was appropriate in some cases, but not in all, and that "[n]ot every case" of murder in an armed robbery warranted imposition of the extreme penalty. Whether death should be imposed, Lambert opined, "depend[s] on how [the murder] happened." Lambert also said that he would not give Turner the death sentence "merely because [he was] charged with . . . and convicted of murder."

Lambert's voir dire responses demonstrated further that he would "be able to consider voting for a sentence less than death such as the alternative sentence of life imprisonment." He responded affirmatively when asked whether he would feel "free to make [his] own mind up based on what [he heard in the courtroom] . . . and not [on] what . . . happened before." And, importantly, he gave an affirmative response to the specific question whether he could refrain from considering "the fact that [Turner had] been sentenced [to death] in a prior hearing."

■ All in all, we think that Lambert's voir dire examination produced nothing that "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams* v. *Texas*, 448 U.S. 38, 45 (1980); *Boggs* v. *Commonwealth*, 229 Va. 501, 515, 331 S.E.2d 407, 417 (1985), *cert. denied*, 475 U.S. 1031 (1986). The question whether a prospective juror stands indifferent in the cause is basically factual, and its resolution requires the exercise of judicial discretion. *Watkins* v. *Commonwealth*, 229 Va. 469, 480, 331 S.E.2d 422, 431 (1985), *cert. denied*, 475 U.S. 1099 (1986). We find no abuse of discretion in the trial court's refusal to strike prospective juror Lambert for cause.

## RESENTENCING AUTHORITY

Turner argues that the trial court had no authority to resentence him. He states that under *Wm. Patterson* v. *Commonwealth*, 222 Va. 653, 283 S.E.2d 212 (1981), he had the right to be sentenced by the same jury that convicted him and that since this was no longer possible, the only recourse was for the trial court to sentence him to life imprisonment.

In *Patterson*, we overturned the defendant's death sentence because the trial court had failed to question prospective jurors about their predisposition to impose the death penalty. 222 Va. at 659, 283 S.E.2d at 216. We held further that because Code § 19.2-264.3(C) did not permit resentencing by a new jury, we were compelled to commute the defendant's sentence to life imprisonment. *Id.* at 660, 283 S.E.2d at 216.

■ Turner acknowledges that following the *Patterson* decision, the General Assembly in 1983 amended Code § 19.2-264.3(C) to permit resentencing of a capital defendant by a different jury where a prior sentence of death has been set aside or declared invalid. Turner also acknowledges that in *Evans* v. *Commonwealth*, 228 Va. 468, 475-76, 323 S.E.2d 114, 118 (1984), *cert. denied*, 471 U.S. 1025 (1985), we upheld the 1983 amendment against the contention that it constituted an *ex post facto* law.

Turner argues, however, that we wrongly decided in *Evans* that the 1983 amendment represented a procedural rather than a substantive change. He opines that in deciding the change was procedural and not an *ex post facto* violation, we incorrectly relied

upon *Dobbert* v. *Florida*, 432 U.S. 282 (1977), when *Thompson* v. *Utah*, 170 U.S. 343 (1898), was the controlling authority.

In *Dobbert*, the law in effect at the time the capital offense was committed made a jury's recommendation of mercy binding upon the court. By the time of trial, the law had been changed to make the jury's recommendation merely advisory. The jury recommended a life sentence, but the trial court rejected the recommendation and sentenced the defendant to death. The Supreme Court affirmed, holding that "the changes in the law [were] procedural, and on the whole ameliorative, and that there [was] no *ex post facto* violation." *Id.* at 292 (footnote omitted).

In *Thompson*, the alleged offense of grand larceny was committed when Utah was still a territory, at which time the law required a 12-member jury for the trial of a felony. The defendant was tried after Utah was admitted to the Union, and he was convicted by an 8-member jury, as permitted by the new state's constitution. The Supreme Court held that the change from a 12-member to an 8-member jury constituted an *ex post facto* violation. 170 U.S. at 355. In reaching its decision, the Court characterized the change in law as substantive, rather than procedural, and as one altering the situation to the defendant's disadvantage. *Id.* at 352-53.

We think that *Thompson* is inapposite and that *Dobbert* is controlling. The distinguishing features between *Thompson*, on the one hand, and *Dobbert* and the present case, on the other, are expressed in *Dobbert* in these words:

> In the case at hand, the change in the statute was clearly procedural. The new statute simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime. The following language from *Hopt* v. *Utah*, [110 U.S. 574 (1884)], applicable with equal force to the case at hand, summarizes our conclusion that the change was procedural and not a violation of the *Ex Post Facto* Clause:
>
>> "The crime for which the present defendant was indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish

his guilt, all remained unaffected by the subsequent statute." 110 U.S., at 589-590.

432 U.S. at 293-94. We reaffirm *Evans*, and hold that the 1983 amendment to Code § 19.2-264.3(C) did not constitute a violation of the *Ex Post Facto* Clause.

## PAROLE ELIGIBILITY

Before the sentencing hearing began, Turner moved the trial court to permit evidence, argument, or instructions on the subject of his eligibility for parole. The trial court denied the motion.

Turner contends this denial was error. He acknowledges the rule in Virginia that evidence or comment concerning parole eligibility is improper, and he admits the rule is designed to benefit defendants. He maintains, however, that in practical effect the rule is detrimental to capital defendants because "jurors know that life termers are eligible for parole" and that to refuse the admission of "truthful information about parole eligibility is to cause the jury to err on the side of fear." Hence, Turner concludes, the rule barring evidence of parole eligibility "improperly increases the risk that the jury would impose [the] death [penalty]" in violation of the Eighth Amendment.

In *Turner I*, we rejected as without merit a contention that "the jury should have been given an instruction concerning the possibility of parole." 221 Va. at 531, 273 S.E.2d at 48. As authority for our ruling, we cited *Clark* v. *Commonwealth*, 220 Va. 201, 214, 257 S.E.2d 784, 792 (1979), *cert. denied*, 444 U.S. 1049 (1980), and *Stamper* v. *Commonwealth*, 220 Va. 260, 278, 257 S.E.2d 808, 821 (1979), *cert. denied*, 445 U.S. 972 (1980). Since *Turner I*, we have rejected similar contentions in other capital murder cases, including *Peterson* v. *Commonwealth*, 225 Va. 289, 296-97, 302 S.E.2d 520, 525, *cert. denied*, 464 U.S. 865 (1983), *Poyner* v. *Commonwealth*, 229 Va. 401, 433, 329 S.E.2d 815, 828, *cert. denied*, 474 U.S. 888 (1985), and *Williams* v. *Commonwealth*, 234 Va. 168, 178-79, 360 S.E.2d 361, 367-68 (1987), *cert. denied*, 484 U.S. ____, 108 S.Ct. 733 (1988).

We perceive no reason to depart from this line of cases. Neither *California* v. *Ramos*, 463 U.S. 992 (1983) (instruction on power of governor to commute life sentence without possibility of parole constitutionally permissible but not constitutionally required), nor *Skipper* v. *South Carolina*, 476 U.S. 1 (1986)

(evidence of defendant's past good behavior relevant and admissible as indicative of probable future conduct), cited by Turner, requires a different result. Accordingly, we again reject Turner's contention regarding parole eligibility.

## VILENESS

■ Turner maintains that the murder involved in this case "was not 'vile' within any constitutional meaning of the Virginia capital sentencing statute." He apparently does not base his complaint upon the facial unconstitutionality of the statute, but upon the proposition that the statutory language defining "vileness" is "intrinsically vague and overbroad." If we read him incorrectly on this point and he does complain of facial unconstitutionality, we find the complaint without merit.

In the very first case we decided under the present death penalty statute, we held that the statutory definitions of the two predicates for imposition of the death penalty, *viz.*, "dangerousness" and "vileness," are not "so vague as to vest the sentencing authority with standardless sentencing power." *Smith* v. *Commonwealth*, 219 Va. 455, 477, 248 S.E.2d 135, 148 (1978), *cert. denied*, 441 U.S. 967 (1979) (rejecting defense argument of facial unconstitutionality). We have maintained this view consistently since *Smith*, without reversal, and we see no reason to change our view now.[2]

Turner does argue, citing *Godfrey* v. *Georgia*, 446 U.S. 420 (1980), that Virginia is constitutionally required to restrict the use of its "vileness" test to cases that "lie at the core." *Id.* at 429. He then asserts that his case does not "lie at the core" of death penalty cases.

The statutory basis for the "vileness" test is found in Code § 19.2-264.2. This section states in pertinent part that a sentence of death may not be imposed unless the court or jury finds the defendant's conduct in committing the offense "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind *or* an aggravated battery to the victim." (Emphasis added.)

The trial court in its instructions permitted the jury to consider the elements of depravity of mind and aggravated battery. In its

---

[2] Turner argues that we must apply stricter standards for determining "vileness" or else face the risk of having the present standards declared unconstitutional. We reject this argument.

verdict, the jury found that Turner's conduct in committing the offense "involved depravity of mind; aggravated battery."

Turner says the court should not have permitted the jury to consider depravity of mind. He argues that we "did not approve [the jury's] finding of depravity of mind" in *Turner I* and that the trial court should have been bound in the present case by our "earlier opinion on the subject."

■ The fact is that we neither approved nor disapproved the depravity-of-mind finding in *Turner I*. We found the evidence sufficient to establish that "Turner committed an 'aggravated battery.'" 221 Va. at 527, 273 S.E.2d at 45. As indicated *supra*, the terms "depravity of mind" and "aggravated battery" are used in Code § 19.2-264.2 in the disjunctive. It was not necessary, therefore, to discuss depravity of mind in *Turner I. See Watkins*, 229 Va. at 489, 331 S.E.2d at 437.

We could take the same course here because we again find the evidence sufficient to establish an aggravated battery. In *Smith*, we defined the term "aggravated battery" as one "which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." 219 Va. at 478, 248 S.E.2d at 149. We think that the evidence of Turner's conduct in killing his victim meets this definition clearly and completely.

■ It would be well, however, to put the depravity-of-mind problem to rest because Turner suggests the jury may have been misled by including this element in instructions when, he says, the element was unsupported by evidence. In *Smith*, we defined the term "depravity of mind" to mean "a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation." *Id*. We think that the evidence of Turner's conduct in killing his victim also meets this standard clearly and completely.

## CLOSING ARGUMENT

During closing argument, defense counsel told the jury that the "reverence for . . . human life" made difficult the decision "to put Willie Turner to death." Continuing, counsel stated that the jury's decision was not merely to put Turner "away for a few years" but "to execute him, to have him electrocuted . . . [t]o strap him in an electric chair and have twenty-five hundred volts —."

At this point, the Commonwealth's Attorney objected, and the trial court sustained the objection. Defense counsel apologized to

the court, but then made a statement to the jury about having Turner "in the electric chair [to] be electrocuted." Again, the prosecutor objected, and the court stated, "I sustain the objection to any reference of how electrocution can be carried out." When defense counsel persisted, the trial judge said: "I don't think it's proper argument and I would ask the jury to disregard any method of execution, which may change from time to time."

On appeal, Turner says that "[i]t is the sustaining of the second objection, and the ruling that prohibited any further argument mentioning electrocution, that is the error complained of." Turner maintains the ruling was erroneous for two reasons: First, it is proper in a capital case for defense counsel "to mention electrocution and the electric chair in asking the jury . . . to exercise their discretion to sentence the defendant to life imprisonment"; second, the argument was a proper response to the prosecutor's actions in asking prospective jurors on voir dire whether they could vote to send someone to the electric chair and in stating to the jury during closing argument that if there was any doubt Turner deserved "the chair," the doubt would have "to come from [the] evidence."

We reject Turner's arguments out of hand. Turner admits on brief: "To remind the jury that the method of execution prescribed in this state (as it has been for 79 years) is electrocution is only reminding them of something they surely already knew." Hence, if there was any error in the trial court's ruling prohibiting further mention of electrocution, a matter we do not decide, the error was certainly harmless.

## INSTRUCTIONS

Turner argues the trial court erred in refusing to grant his tendered instructions 1A, 1B, 1C, 1D, and 1E. Turner says he merely wanted, through these instructions, to have the jury told that it could return a verdict for a life sentence even though it found aggravating circumstances but no mitigating factor, that the burden was upon the Commonwealth to prove beyond a reasonable doubt the death penalty should be imposed, and that the death penalty is reserved for the most outrageous or wantonly vile, horrible, and inhuman murders.

The difficulty with Turner's argument is that the trial court in other instructions informed the jury fully of all the essential elements it must find beyond a reasonable doubt before fixing Turner's punishment at death. Yet, the court's instructions left

the jury free to fix the sentence at life imprisonment if it found neither "dangerousness" nor "vileness" had been proven, or if it believed the death penalty was not justified, or if it found any matter concerning the offense or the offender which extenuated or reduced the degree of moral culpability or blame. On the other hand, the instructions offered by Turner tended to be repetitive and argumentative and to misstate the law. We find no error, therefore, in the trial court's refusal of Turner's instructions.

## DEATH PENALTY DISCRIMINATORILY BASED UPON RACE

In the trial court, Turner proffered "certain statistical evidence concerning the discriminatory impact of the death sentence in Virginia." Turner told the court he was proffering the evidence in anticipation of the decision in *McCleskey* v. *Kemp*, then pending in the Supreme Court of the United States.

Since Turner's proffer in the trial court, the Supreme Court has decided *McCleskey* v. *Kemp*, rejecting a statistical study of alleged racial discrimination in death penalty cases in Georgia. 481 U.S. \_\_\_\_, 107 S.Ct. 1756 (1987). Turner admits that, as a result, "a capital defendant cannot adduce statistical evidence of disparate impact to prove that an entire statutory scheme is invalid." He asks this Court, however, "to hold to the contrary." We decline the request.

## SENTENCE REVIEW

Under Code § 17-110.1(C), this Court must determine whether "the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor." We must also determine whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

Turner makes no direct contention that his death sentence was imposed under the influence of passion, prejudice, or other arbitrary factor, but says that "[i]mposition of the death sentence in this case would be disproportionate to the crime, in violation of the Eighth Amendment, and would be evidence of passion or prejudice." In any event, we find no evidence of passion, prejudice, or other arbitrary factor involved in Turner's sentence and will

confine our consideration, therefore, to the question of excessiveness or disproportionality.

In making our proportionality review, we have accumulated "the records of all capital felony cases . . . as a guide in determining whether the sentence imposed in the case under review is excessive." Code § 17-110.1(E). Where, as here, the basis of the imposition of the death sentence is "vileness," we give particular attention to those cases in which the death penalty was based upon the same predicate.

Turner cites prior cases where the "vileness" involved was admittedly greater than the "vileness" present here. *E.g., Fitzgerald* v. *Commonwealth*, 223 Va. 615, 292 S.E.2d 798 (1982), *cert. denied*, 459 U.S. 1228 (1983) (rape-robbery-murder victim cut at least 184 times with machete and knife). But no concept of proportionality requires that each new capital murder case equal in horror the worst possible scenario yet encountered, else the death penalty may not be imposed. As we said in *Turner I*: "While the atrociousness involved in Turner's murder does not rise to the level evidenced in *Stamper*,[3] *James Dyral Briley*,[4] or *Coppola*,[5] Turner's murder is just as brutal as the murders in *Linwood Earl Briley*[6] and *Clark*[7] . . . ." 221 Va. at 530, 273 S.E.2d at 47.

In a proportionality review, we inquire whether "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." *Stamper*, 220 Va. at 284, 257 S.E.2d at 824. Considering both "the crime and the defendant" (Code § 17-110.1(C)(2)), we can say with confidence that juries in this jurisdiction generally approve the supreme penalty for offenses comparable to the murder committed by Turner. Indeed, recently, we cited *Turner I* in demonstrating that a death sentence imposed upon a different defendant was not "excessive or disproportionate to sentences generally imposed by juries in Virginia for similar crimes." *Barnes* v. *Commonwealth*, 234 Va. 130, 139, 360 S.E.2d 196, 203 (1987), *cert. denied*, 484 U.S. ___, 108 S.Ct. 763

---

[3] *Stamper* v. *Commonwealth*, 220 Va. 260, 257 S.E.2d 808 (1979), *cert. denied*, 445 U.S. 972 (1980).

[4] *James Dyral Briley* v. *Commonwealth*, 221 Va. 563, 273 S.E.2d 57 (1980).

[5] *Coppola* v. *Commonwealth*, 220 Va. 243, 257 S.E.2d 797 (1979), *cert. denied*, 444 U.S. 1103 (1980).

[6] *Linwood Earl Briley* v. *Commonwealth*, 221 Va. 532, 273 S.E.2d 48 (1980), *cert. denied*, 451 U.S. 1031-32 (1981).

[7] *Clark* v. *Commonwealth*, 220 Va. 201, 257 S.E.2d 784 (1979), *cert. denied*, 444 U.S. 1049 (1980).

(1988) ("vileness" found in murder of store owner shot three times during struggle with robber).

 Finding no error in the record or any other reason to disturb Turner's death sentence, we will affirm the judgment of the trial court.

*Affirmed.*