# RONALD BERNARD BENNETT

## v.

# COMMONWEALTH OF VIRGINIA

Record Nos. 880362 and 880389

November 18, 1988

Present: Carrico, C.J., Poff, Compton, Stephenson, Russell, and Thomas, JJ., and Gordon, Retired Justice

450

*Robert J. Rice (Fred A. Talbot; Mark S. Brennan; Bremner, Baber & Janus, on brief), for appellant.*

*Richard B. Smith, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.*

THOMAS, J., delivered the opinion of the Court.

Ronald Bernard Bennett was convicted, in a jury trial, of the capital murder of Anne Keller Vaden during the commission of robbery while armed with a deadly weapon, Code § 18.2-31(d), of robbery, Code § 18.2-58, and of breaking and entering the victim's dwelling place at night with the intent to commit larceny, Code § 18.2-91. He was sentenced to life in prison for the robbery and ten years in prison for the breaking and entering. Following a separate sentencing hearing, with regard to the capital murder conviction, the jury fixed his sentence at death based on the vileness of the crime. Code § 19.2-264.4(C).

We have consolidated Bennett's appeal of his capital murder conviction with the automatic review of his death sentence required by Code § 17-110.1. In addition, by order dated April 11, 1988, we certified Bennett's appeal of his robbery and breaking and entering convictions from the Court of Appeals, Code § 17-116.06, and have given the entire matter priority on our docket, Code § 17-110.2.

## FACTS

The victim was murdered on November 16, 1985, at her apartment in Chesterfield County. Anne's parents spoke to her on the night of November 15, because all three of them were planning to leave on a trip early the next morning. Anne agreed to meet her parents at their house in time to depart by 5:30 a.m.

Anne's father knew she was a late sleeper so he called her at 4:50 a.m. the morning of November 16. When she answered the phone her voice was weak. She said "Daddy are you coming to get me." He reminded her that she was supposed to be at his house at 5:30. She replied "Oh, that's right." When he hung up the phone Anne's father felt something was wrong; he asked his wife to call again. She called at 5:00 a.m. This time the victim said: "Mother, I'll be all right."

Anne's father called again at 5:20 a.m. but got no answer. He thought she might have left to come to his house but decided to drive to her apartment, which was only eight miles away. When he got there, Anne's car was still there, but she did not respond to his pounding at the door.

Mr. Keller returned home and had his wife call the apartment complex to have someone meet him with a key. When Mr. Keller returned to the apartment he touched the door and this time the door flew open.

He found his daughter's nude body at the foot of the bed. Her body was still warm. She was bound hand and foot with blue pantyhose material. The same blue material was around her neck. She was dead.

The medical examiner testified that Anne had been beaten over much of her body with a blunt object, most probably a liquor bottle found at the scene. She had sustained multiple blunt impact injuries to her head, face, and right hand. She had been stabbed four times: three times in the neck and once in the abdomen. She had been strangled. All of the injuries had been inflicted while she was alive. Each type injury was fatal. In the medical examiner's opinion it would take twenty to thirty minutes for the victim to have sustained all these injuries. The cause of death was determined to have been all the separate categories of injury. The medical examiner testified as follows: "I felt there was actually, in this case, three separate types of injuries which each could have caused her death."

The victim was Caucasian. The defendant is Black. An examination of hairs taken from her sheets and pillowcases identified hairs of Negroid origin. However, the hair fragments were such that no more specific identification could be made.

No unidentified fingerprints were found in the apartment. However, the clear imprint of a bloody, gloved left hand was found on one of the sheets. The evidence established that when Bennett worked as a maintenance man, he always wore cotton gloves.

For more than a year, the Chesterfield police had no real leads concerning the crime. Then, in December 1986, the police received a telephone call from officials in California reporting that a woman named Mary Bennett had advised California authorities of a murder which had been committed in Virginia approximately a year earlier. Chesterfield police officers flew to California, interviewed Mary Bennett, and retrieved from her a custom-made diamond ring which, according to Mary, had belonged to the murder victim. Based on the information provided by Mary, the defendant was arrested in December 1986 and indicted in March 1987.

The evidence adduced at trial by the Commonwealth came in large part from Mary's testimony. Prior to and after Anne's murder, Bennett had worked as a maintenance man at Anne's apartment complex. On two occasions, Bennett had done work in Anne's apartment; once when she was home, another time when she was not. On the occasion when Anne was at home, she gave Bennett and his supervisor something to eat. As a maintenance man, Bennett had access to the apartment complex's "grand master key." This key gave Bennett access to every unit at the complex. Prior to the murder, Bennett had secretly made a copy of the grand master key.

On November 15, 1985, about 5:30 p.m., Bennett, his cousin, Kenneth Harris, and Mary went to the Church Hill section of Richmond to a "dope house" to purchase and use drugs. After his money ran out, Bennett said he was going to go get more money and left Mary and Ken at the dope house. He left between 9:30 and 10:00 p.m. Mary and Ken waited until 1:00 a.m., but Bennett never returned.

Mary called Bennett's mother who picked up Mary and Ken and took them to the apartment shared by Mary and Bennett. Mary's keys were locked inside so Ken forced the door open to gain entry. Mary retrieved her car keys and she and Ken drove around until 3:00 a.m. looking for Bennett; they did not find him.

Bennett returned to the apartment about 7:00 a.m. on November 16. Ken opened the door. Bennett was covered with blood and carrying a brown airline-type carry-on suitcase. Blood was on Bennett's shirt, pants, and tennis shoes. He explained to Ken and Mary that he had gotten into a fight with some men in Church Hill. Mary did not believe him.

Bennett and Mary went into the bedroom. There she argued with him about his being out all night. He then told Mary that "he had just killed a girl at the Boulders Apartments." Later, he explained that he had to kill her because she could identify him. Bennett removed his bloody clothes and took a shower. Then he put the discarded clothes in a garbage bag and threw the bag in a dumpster behind his apartment.

That night, he took some rings from the brown flight bag and put them on the kitchen counter saying that he had taken them from the victim's apartment. One ring was a diamond ring with one large stone and eleven smaller stones. Another was an opal ring. The victim had worn these rings almost all the time. She was last seen wearing them at work about 3:00 p.m. on November 15. Mary kept the diamond ring. Bennett gave the opal ring to his brother who in turn gave it to his wife.

After the murder, Mary broke up with Bennett and ultimately moved to California. There, in December 1986, Mary showed the diamond ring to a friend, told the friend how she had gotten the ring, and made clear that she wanted to tell someone what had happened. Mary told authorities in California who called authorities in Virginia. These calls resulted in Bennett's arrest.

Bennett was arrested on December 17, 1986, at his mother's house. He was advised of his rights and taken to police headquarters where his arrest warrants were read to him. One warrant was for aggravated sexual assault. When this warrant was read to him, Bennett remarked as follows: "You ain't saying I raped that girl, are you." A search of Bennett's mother's house produced the brown flight bag taken from the victim's apartment.

## I. *Mary Bennett's Right to Testify*

Mary Allbee Bennett was the Commonwealth's key witness. Bennett's entire trial strategy was to prevent her from testifying. Indeed, defense counsel advised the trial court in an *ex parte* hearing that unless Mary could be prevented from testifying, Bennett had no defense.

In his effort to exclude Mary's testimony, Bennett relied upon Code § 19.2-271.2 which provides in pertinent part that "[i]n criminal cases . . . neither [husband nor wife] shall be compelled, nor, without the consent of the other, allowed to be called as a witness against the other." Bennett contended at trial that he and Mary were husband and wife. The trial court disagreed and allowed Mary to testify. Bennett contends the trial court erred in permitting Mary to testify. In our opinion, the trial court correctly decided this issue.

### A. *Mary's Testimony at the Hearing To Determine her Marital Status*

On October 14, 1987, the trial court held a hearing to determine whether Bennett and Mary were married and whether Code § 19.2-271.2 applied to Mary. Bennett contends it was error to permit Mary to testify at that threshold hearing.

In order to explain this argument fully, we must set forth additional facts. The trial had originally been scheduled for August 20, 1987. On August 15, 1987, defense counsel requested a continuance. They refused to state, in the presence of the Commonwealth's Attorney, their reasons for requesting the continuance.

The trial court permitted Bennett's counsel to state their reasons in an *ex parte* proceeding. There, they advised the court that Mary and Bennett had participated in a marriage ceremony on September 22, 1980, in California, but that previously, on November 12, 1976, also in California, Mary had married Donald Allbee and the couple had never been divorced. Defense counsel thus admitted that, as of August 1987, Mary and Bennett were not married because their marriage was bigamous and, therefore, void.

However, defense counsel explained further that, in July 1978, in California, Mary had filed for divorce from Donald and that in July 1979, she had been awarded an interlocutory judgment of divorce. Counsel acknowledged that the interlocutory judgment was not a final judgment of divorce. They explained, however, that under California law, once an interlocutory judgment has been entered, a third party, such as Bennett, who has an interest in securing the divorce of Mary and Donald, could request that the divorce be made final. In addition, they explained that the California courts were empowered, by statute, to grant a *nunc pro tunc* final judgment of divorce which would validate Mary's subsequent marriage to Bennett. Bennett's counsel asked for a continu-

ance so that they could validate Bennett's marriage to Mary. The trial court granted the continuance until October 13, 1987.

When trial commenced on October 13, the jury was impaneled. On October 14, the hearing concerning Mary's testimony was held. Bennett's counsel proffered an authenticated copy of Mary and Bennett's September 22, 1980 marriage license. Based on this document, defense counsel moved to exclude Mary's testimony.

The Commonwealth called Mary as a witness to testify as to her marital status. Bennett's counsel objected, contending that Mary could not testify even to determine her status as Bennett's wife.

Bennett argues that when the Commonwealth called Mary to testify on October 14, she was being called to testify "against" him. According to Bennett, Code § 19.2-271.2 does not permit one spouse to be called to testify against the other at any stage of a criminal case.

■ In our opinion, when Mary was called as a witness on October 14, she was not called to testify against Bennett. We said in *Brown* v. *Commonwealth*, 223 Va. 601, 606, 292 S.E.2d 319, 327 (1982), that because the statutory provision, here invoked by Bennett, operates to limit the introduction of relevant evidence, it must be strictly construed against the existence of the privilege. The October 14 proceeding had nothing to do with Bennett's guilt or innocence. It was solely concerned with whether Bennett and Mary were married. We conclude, in light of *Brown*, that the testimony sought from Mary on October 14 could not be fairly described as testimony against Bennett.

■ Bennett also argues that Mary should not have been allowed to testify on October 14 because once he introduced into evidence the September 22, 1980 marriage license, the marriage between Bennett and Mary was presumed valid in that it was most recent in time. This argument is plainly without merit. Bennett attempts to invoke the presumption that the second marriage of the same person is valid; but that presumption is rebuttable. *See DeRyder* v. *Insurance Company*, 206 Va. 602, 607, 145 S.E.2d, 177, 181 (1965); *Parker* v. *American Lbr. Corp.*, 190 Va. 181, 185, 56 S.E.2d 214, 216 (1949). Mary's testimony was intended to rebut that presumption.

■ Moreover, Bennett's interpretation of Code § 19.2-271.2 would mean that once the statute was invoked, the person whose testimony was sought to be barred would be unable to testify that

the alleged marriage was nonexistent. Such an approach would permit a criminal defendant to use the statute to silence one of the most authoritative witnesses concerning the existence of a marriage: the putative spouse. We reject Bennett's argument. By logic and reason, a trial court must be empowered to take evidence to determine the applicability of a statutory provision which has been invoked by a party.

Further, as set forth above, in the August 1987 *ex parte* continuance hearing, Bennett's counsel admitted that Bennett and Mary were not married. When Mary was called to testify on October 14, nothing had yet been brought to the trial court's attention to suggest that anything had changed since August with regard to Mary's marital status.

## B. *Mary's Testimony at Trial*

Bennett also argues that Mary should not have been permitted to testify during the trial of the case, where she provided important evidence of his guilt. He bases this argument on a California court order which he introduced into evidence at the October 14 hearing previously discussed.

During the seven week continuance, which the trial court granted to Bennett from August 15, 1987, to October 13, 1987, Bennett was able to secure, in California, a final judgment dissolving the marriage between Mary and Donald Allbee. This was accomplished without any notice to Mary or Donald.

At the October 14 hearing, Mary testified that she was still married to Donald. She then left the courtroom. Thereafter, Donald testified that he was still married to Mary. He then left the courtroom. Bennett's counsel next introduced into evidence a California court order dated August 20, 1987, granting Mary and Donald a final divorce *nunc pro tunc* to March 2, 1980 — a date more than six months prior to the marriage ceremony involving Bennett and Mary. Bennett argued that the California court order was entitled to full faith and credit in Virginia and that it validated Bennett's marriage to Mary.

The Commonwealth asked for and received a continuance. Court proceedings were instituted in California on behalf of Mary and Donald to set aside the August 20 *nunc pro tunc* judgment. By order dated October 19, 1987, the California court set aside the August 20 order. Bennett appealed the October 19, 1987 or-

der. Mary and Donald filed a cross-appeal challenging the August 20, 1987 *nunc pro tunc* order.

On October 21, 1987, the Commonwealth introduced a copy of the entire California court file, including the order which vacated the August 20 *nunc pro tunc* order on which Bennett relied to validate his marriage to Mary. The trial court concluded that Mary and Donald were still married and ruled that Mary could testify.

Bennett argues that when, on October 14, he introduced into evidence the August 20 *nunc pro tunc* judgment, the trial court should have given it immediate effect under the Full Faith and Credit Clause of the Constitution of the United States. He argues further that whenever a judgment of a sister state is properly introduced into evidence in a Virginia court, the only permissible inquiry is whether the sister state had jurisdiction to enter the order. He argues further that once jurisdiction has been found to exist, the foreign judgment must be given effect, without more.

■ We do not agree that the Full Faith and Credit Clause requires instantaneous acceptance of every authenticated judgment from a sister state. Code § 8.01-389(B) provides in pertinent part that "[e]very court of this Commonwealth shall give such records of courts not of this Commonwealth the full faith and credit *given them in the courts of the jurisdiction from whence they came.*" (Emphasis added.) The italicized language is fully in keeping with Supreme Court jurisprudence concerning the Full Faith and Credit Clause. *See, e.g., Durfee* v. *Duke*, 375 U.S. 106, 109 (1963); *Halvey* v. *Halvey*, 330 U.S. 610, 614 (1947). The language of Code § 8.01-389(B) makes clear that it is appropriate to determine what credit the originating state would give its own judgment when that state is advised of the full circumstances surrounding the entry of the particular judgment. In this case, the California court, by vacating the *nunc pro tunc* judgment, showed, in effect, that it would not have entered that judgment had it known that Mary and Donald did not receive notice of the proceeding.

■ In advancing his argument of instantaneous acceptance of authenticated foreign decrees, Bennett relies upon *Bloodworth* v. *Ellis*, 221 Va. 18, 267 S.E.2d 96 (1980). *Bloodworth* is inapposite. That case concerns a Virginia court's giving effect to, or refusing to give effect to, a foreign decree. It does not concern the entirely different question whether a Virginia court can, in proper

circumstances, permit Virginia litigants to ask a sister state to reconsider that state's own judgment.

The Full Faith and Credit Clause was not implicated by what happened here. The trial court did not refuse to give full faith and credit to the August 20 *nunc pro tunc* order. It simply gave the Commonwealth a reasonable time in which to ask the California court to reconsider the correctness of its own judgment. Moreover, from a full faith and credit standpoint, the trial court gave effect to the most recent California order, the October 19 order which vacated the August 20 *nunc pro tunc* order. We hold that there was no violation of the Full Faith and Credit Clause in this case.

## II. *The Propriety of Granting Continuances After the Jury Had Been Impaneled*

■ The second major issue advanced by Bennett concerns the trial court's decision to grant certain continuances after the jury had been impaneled and jeopardy had attached. In addressing this issue, Bennett concedes, as he must, that the grant or denial of continuances rests in the sound discretion of the trial court. *See, e.g., Lomax* v. *Commonwealth*, 228 Va. 168, 319 S.E.2d 763 (1984); *Gilchrist* v. *Commonwealth*, 227 Va. 540, 317 S.E.2d 784 (1984).

Although Bennett claims the trial court granted "numerous" continuances to the Commonwealth, our review of the record discloses only two. The first was from October 15, 1987 to October 19. The second was from October 20 to October 21. The Commonwealth used the first continuance to have the August 20 *nunc pro tunc* order set aside. It used the second to have the California court file properly authenticated so that it could be introduced into evidence. Bennett argues that both continuances had devastating effects upon his defense and operated to violate his right to due process and, in essence, his "right to surprise" the Commonwealth. In our opinion, Bennett had no "right of surprise" which could have been violated and there was no denial of due process.

### A. *The October 15 Continuance*

On October 14 Bennett's counsel introduced into evidence the August 20 *nunc pro tunc* order. The Commonwealth had prepared its case on the assumption that, because Mary was married to Donald at the time she purportedly married Bennett, the marriage

to Bennett was void. The Commonwealth was caught by surprise and asked for a continuance.

When the trial court granted Bennett his seven week continuance in August 1987, it advised defense counsel that if the Commonwealth was surprised by the effort to validate Bennett's marriage to Mary, then the Commonwealth would be given a short recess or continuance. Defense counsel responded that a short recess would do no good because the issue was very complex.

In that August *ex parte* hearing, defense counsel made clear that their entire strategy was to surprise the Commonwealth.* They made clear that no actual notice would be given to Mary and Donald of Bennett's effort to secure a final divorce for them. The reason for the secrecy was to keep Mary and Donald from objecting to the proceeding because an objection would cause delay and "any delay would obviously deprive Mr. Bennett of his defense, and its element of surprise." Defense counsel stated further that "it's in Mr. Bennett's best interest that the Commonwealth be as unprepared as possible"; "that any knowledge on the part of the Commonwealth could impede the process"; and that defense counsel "really just don't want to give the Commonwealth any opportunity in advance to prepare for what the defense has spent months trying to put together."

■ Bennett cannot successfully attack the trial court's decision to grant the October 15 continuance on the ground that his "right of surprise" was undermined. There is no such right. *See Williams* v. *Florida*, 399 U.S. 78, 88 (1970).

■ The aim of trials is to find the truth. Uncovering the truth is the paramount goal of the adversary system. All the rules of decorum, ethics, and procedure are meant to aid the truth-finding process. Ambush, trickery, stealth, gamesmanship, one-upmanship, surprise have no legitimate role to play in a properly conducted

---

* On brief, Bennett contends that the trial court endorsed its effort to surprise the Commonwealth. Bennett states that during the August *ex parte* hearing, the trial court agreed that Bennett's securing a *nunc pro tunc* divorce for Mary and Donald was an essential and vital tactic in Bennett's defense. Bennett claims further that the trial court acknowledged that it was in Bennett's best interest to catch the Commonwealth off guard and to surprise the Commonwealth.

Our review of the record does not support the contention that the trial court, in effect, condoned and encouraged defense counsel's tactic of surprise. Indeed, the trial court urged defense counsel to advise the Commonwealth of what was contemplated so that the question of Mary's right to testify could be resolved in an orderly fashion without a race to the California courthouse.

trial. This is so whether the gamesman is the defendant or the Commonwealth. We agree with what Justice White said, writing in *Williams*: "The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played." *Id.* at 82.

When a litigant is surprised in the midst of a trial, that is precisely the situation in which a continuance may be appropriate. In *Williams*, the Supreme Court said this about continuances in the midst of trial: "Petitioner concedes that absent the notice-of-alibi rule *the Constitution would raise no bar to the court's granting the State a continuance at trial on the ground of surprise* as soon as the alibi witness is called." *Id.* at 85 (emphasis added). No doubt continuances in the midst of trial should not be an everyday occurrence. Nevertheless, such decisions are entrusted to the sound discretion of the trial court. Bennett argues against established legal principles when he contends that the very fact he succeeded in surprising the Commonwealth means the Commonwealth is not entitled to a continuance. We reject his argument.

Nor are we persuaded that the October 15 continuance should not have been granted because the jury had already been impaneled. A similar issue was addressed in *Webb* v. *Hutto*, 564 F.Supp 405 (W.D. Va. 1982), *rev'd*, 720 F.2d 375 (4th Cir. 1983), *cert. denied*, 465 U.S. 1080 (1984). That case was before the district court upon federal habeas corpus review of a state court conviction for possession of marijuana with intent to distribute. Webb complained, among other things, that his right to be free from double jeopardy was violated when the trial court "granted the prosecution a continuance during the presentation of the state's evidence solely for the purpose of seeking out additional evidence against the accused." *Id.* at 406. The continuance was for five days. The district court concluded that once jeopardy attaches "the prosecutor may not stop the trial merely because of insufficient evidence or missing indispensable witnesses." *Id.* at 410. The Fourth Circuit reversed. *Webb*, 720 F.2d 375.

According to the Fourth Circuit, the most charitable thing which could be said about the prosecutor was that his work had been "sloppy" in failing to subpoena certain key witnesses. *Id.* at 378. But, according to the Fourth Circuit, at least he "woke up" and requested a continuance. The appeals court was not troubled by the five-day in-trial delay saying that, from a speedy trial standpoint, it fell "well within the customary time limits for a

continuance." And, even though the new witnesses helped convict the accused, the Fourth Circuit said there was a "total lack of prejudice to the defendant." *Id.* With regard to the question of prejudice, the appeals court said:

> *We simply are not prepared to assign to him vested rights in an ill-prepared prosecutor.* Except for a claimed "right" not to have the case properly tried, with the ascertainment of truth enhanced, Webb points to nothing which has operated to injure his posture before the Circuit Court for the City of Salem.

*Id.* at 381 (emphasis added). The Fourth Circuit concluded that by granting the continuance, the state trial court showed that it was "scrupulously interested in insuring that justice be done." *Id.*

We hold that the trial court did not abuse its discretion in granting the October 15 continuance. The Commonwealth was obviously surprised by the *nunc pro tunc* judgment of divorce. The four-day continuance which included a Saturday and a Sunday was well within reason. Indeed, the Commonwealth had requested only a two-day continuance, from Thursday at noon until Saturday morning. Bennett's counsel objected to any continuance, but stated that if one were granted, a four-day continuance was better for their schedule.

Bennett also argues that his "rights" were violated because the October 15 continuance was used for what Bennett submits was an improper purpose. In this regard, Bennett reasserts his argument that the trial court should have given the August 20 *nunc pro tunc* California order immediate effect. We have already rejected that argument. It follows that we reject the contention that it was improper to use the continuance to request the California court to review its own order.

In a related argument, Bennett contends the Commonwealth misled the trial court by advising the court that the October 15 continuance was for the purpose of researching California law when in reality it was to initiate a California court proceeding. We do not think that the Commonwealth misled the trial court. The Commonwealth indicated from the outset that it planned to attack the California order and the trial court recognized such an attack as a possible approach available to the Commonwealth. Moreover, Bennett states on brief that it was "obvious" what the

Commonwealth was really attempting to do. If it was obvious, then no one was misled. There is no merit to this contention.

## B. *The October 20 Continuance*

Bennett next argues that when the trial court granted a continuance on October 20, 1987, to permit the Commonwealth to properly authenticate the California court file, the trial court violated his rights by aiding the Commonwealth in securing evidence against him. On October 20, the Commonwealth proffered the California court file. Bennett's counsel objected on the ground the file was not properly authenticated as required by Code § 8.01-39.1. The trial court responded as follows: "I'm disposed to continue today and tell you to get a specific authentication that clearly complies with the statute." The trial court commented that the file looked authentic but that it did not comply with Virginia law, possibly because it had been authenticated pursuant to California law instead of Virginia law.

Bennett argues that *Owens* v. *Commonwealth*, 216 Va. 315, 218 S.E.2d 530 (1975), indicates that a continuance should not be granted to allow the Commonwealth to strengthen its case against a defendant. *Owens* does not stand for that proposition. There, the defendant objected, on the basis of hearsay, to the introduction by the Commonwealth of a certificate of analysis to prove the existence of a controlled substance. The trial court offered to grant *the defendant* a continuance so the chemist who prepared the report could be called as a witness. When the defendant declined the continuance, the trial court admitted the certificate. In *Owens*, the Commonwealth did not ask for a continuance. Instead, the defendant was presented with the Hobson's choice of either accepting inadmissible hearsay evidence or accepting a continuance so that the Commonwealth's evidence could be properly admitted. In the instant appeal, the defendant was not put to such a choice. We find no abuse of discretion in the trial court's granting the Commonwealth a continuance from 12:25 p.m. on October 20, 1987, to the start of trial on October 21 in order to allow the authentication of important papers.

## III. *Calling the Commonwealth's Attorney as a Witness*

Bennett next argues that the trial court should have permitted him to call the Commonwealth's Attorney as a witness to

determine the actual reasons for the October 15 continuance and to determine whether he had violated an order to exclude witnesses from the October 14 hearing concerning Mary's right to testify. In *Durrette* v. *Commonwealth*, 201 Va. 735, 113 S.E.2d 842 (1960), we made clear that it is not desirable for the Commonwealth's Attorney to testify as a witness on a material point in a case. The circumstances are rare indeed where any lawyer may properly testify in a case in which he is participating as an advocate. Decisions of this kind must be left to the sound discretion of the trial court.

### A.  Questions Concerning the Reasons for the October 15 Continuance

The trial court did not abuse its discretion when it denied Bennett's request to question the Commonwealth's Attorney about the real reasons for the October 15 continuance. This is so because, as stated earlier, it was obvious to Bennett that the August 20 *nunc pro tunc* order was being challenged in California. There was no need to put the Commonwealth's Attorney on the witness stand to state the obvious. Further, Bennett's Virginia counsel were in contact with California counsel who were monitoring the proceedings in California and advising Virginia counsel what was going on.

### B.  Questions Concerning Possible Violations of Order Excluding Witnesses

The trial court also refused to allow Bennett to question the Commonwealth's Attorney concerning possible violation of an order excluding witnesses. This issue arose in the following context: At the beginning of the October 14 hearing, Bennett specifically moved to exclude Mary and Donald from the hearing. They testified one at a time. When they finished testifying, they left the courtroom. After Mary and Donald were out of the courtroom, Bennett's counsel produced the August 20 *nunc pro tunc* order. By this procedure, Bennett intended to keep Mary and Donald from having knowledge of their own divorce.

Following the October 14 hearing, certain county officials along with Mary and Donald left, by plane, for California. Bennett argued that Mary and Donald would not have flown to California unless they had been told what transpired concerning their

divorce. The trial court would not permit Bennett to call the Commonwealth's Attorney as a witness on this issue. The trial court suggested that Bennett's counsel question Mary and Donald about what they had been told. In our opinion, the trial court's approach did not involve an abuse of discretion. It sought to strike a balance between the reluctance to put an attorney on the witness stand in the course of a case handled by that attorney and the need to develop information which might demonstrate the violation of an exclusion order.

### IV. *Disallowing Mary's Testimony Because of Violation of Order Excluding Witnesses*

Bennett argues that the trial court should not have admitted Mary's testimony because she had been excluded from the October 14 hearing yet had learned about what happened in that hearing. He argues further that the testimony given by Investigator Showalter who sat through the October 14 hearing also should have been excluded. Bennett complains that Showalter was not designated as a witness when he sat through the hearing but was thereafter called as a witness.

██ A trial court has discretion to decide whether a witness who violates an exclusion order should be prevented from testifying. *Brickhouse* v. *Commonwealth*, 208 Va. 533, 537, 159 S.E.2d 611, 614 (1968). Factors to be considered in resolving the question include whether there was prejudice to the defendant and whether there was intentional impropriety attributable to the prosecution. It is also pertinent whether the out-of-court comments concerned any substantive aspect of the case and whether they had any effect on the witness' testimony. *See United States* v. *Buchanan*, 787 F.2d 477, 485 (10th Cir. 1986). In *Huddleston* v. *Commonwealth*, 191 Va. 400, 405, 61 S.E.2d 276, 279 (1950), we explained that the "purpose of excluding the witnesses from the courtroom is, of course, to deprive a later witness of the opportunity of shaping his testimony to correspond to that of an earlier one."

In the instant appeal, the rule to exclude Mary and Donald from the hearing concerning their marital status had nothing whatever to do with preventing the conformity of their testimony. The purpose in this case was to keep them from having notice of their own divorce. It is noteworthy, too, that they were spoken to after they testified, not before. What they were told had nothing

to do with anyone else's testimony but with a document which provided that they were divorced. Further, neither Mary nor Donald changed their testimony. When they first testified, they said they were married. When they were confronted with the existence of the August order, they continued to contend that they were married.

Here, the record is clear that a representative of the Commonwealth's Attorney's office told both Mary and Donald that a divorce decree had been entered in their case. But the Commonwealth's Attorney explained that he thought his witnesses had lied to him and he had a duty to determine whether they had committed perjury. We acknowledge the existence of a rule violation but are constrained to focus upon the question that is properly before us on appeal and that is whether it was an abuse of discretion to permit Mary and Donald to testify despite the violation.

In *Brickhouse*, we said with regard to the then existing statute concerning the exclusion of witnesses, that "[t]here is nothing in the language of the statute to support the argument of counsel for the defendant that the presence of a witness in the courtroom, in disobedience of the order of exclusion, disqualifies such witness from testifying." 208 Va. at 537, 159 S.E.2d at 614. Under all the facts and circumstances of this case, we hold that it was not an abuse of discretion to allow Mary to testify despite her having been told by the Commonwealth's Attorney that she and Donald were divorced.

With regard to Showalter's testimony, there was simply no showing of prejudice. His testimony was inconsequential. He merely said that while he was in Palo Alto, California, he saw petitions filed on behalf of Donald and Mary. Bennett does not explain, nor do we perceive, how this testimony prejudiced him in any way.

## V.  *Use of Statement Made by Bennett to Police*

By order dated June 17, 1987, the trial court directed the Commonwealth to disclose to defendant the substance of any oral statements or confessions made by the accused to any law enforcement officer. The Commonwealth responded that there were no such statements. With trial scheduled for October 13, 1987, the Commonwealth, on October 8, 1987, advised defense counsel that Bennett had made an oral statement to Investigator Ernie Hazzard at the time of his arrest in December 1986. As noted above,

when the investigator read Bennett an arrest warrant charging aggravated sexual assault, Bennett replied, "[y]ou ain't saying I raped that girl, are you." Defense counsel met with the Commonwealth's Attorney and the investigator on October 9, 1987, and learned the details of Bennett's statement.

## A. *Violation of Discovery Order*

On appeal, Bennett complains the disclosure was late and that, as a result, the investigator should not have been allowed to testify concerning Bennett's statement. The Commonwealth's Attorney explained that he did not learn of the statement until shortly before he disclosed it to the defense. The trial court concluded, as a matter of fact, that the Commonwealth's Attorney disclosed the statement as soon as he was aware of it.

In our opinion, the timing of the disclosure did not require the exclusion of defendant's statement. Defense counsel learned of the statement on October 8. Investigator Hazzard did not testify until October 22, fourteen days later. In *Robinson v. Commonwealth*, 231 Va. 142, 155, 341 S.E.2d 159, 167 (1986), we said that there was no violation of a discovery order where the Commonwealth disclosed information as soon as it was received, even though it was in the midst of the trial. Moreover, we held that there was no prejudice, in any event, where the information was disclosed in time to be put to use. *Id.*; *Davis v. Commonwealth*, 230 Va. 201, 204, 335 S.E.2d 375, 377-78 (1985). In this case, we conclude that there was neither a discovery violation nor a showing of prejudice.

## B. *Prejudicial Impact of Statement*

Bennett also complains that the prejudicial impact of his statement outweighed its probative value and for that additional reason it should have been excluded. We disagree.

Bennett contends the statement was inflammatory because it would inject into the case an issue of sexual abuse for which he had not been charged and for which he was not on trial. The Commonwealth argues, and we agree, that the statement had probative value because taken in the context of his being read the warrants, it suggested that he took issue with the charge of sexual abuse because he knew he had not done such a thing. It suggested that Bennett knew what actually occurred when Anne was killed.

Hazzard's testimony was first proffered to the trial court outside the presence of the jury so that the trial court could decide the question of prejudice. The trial court asked defense counsel what limits they would like placed on Hazzard's testimony. Ultimately, defense counsel said they objected to the statement coming in at all and requested nothing further of the trial court.

When the investigator testified before the jury, he did not mention anything about sexual battery. He simply said that while he was reading the arrest warrants to Bennett, Bennett interrupted and made the statement here in issue. Defense counsel on cross-examination raised the point of the charge having "a sexual connotation." Thereafter, defense counsel changed from their first position and asked the trial court to advise the jury that defendant had been charged with sexual battery but that charge had been dismissed for lack of evidence. The trial court complied with this request.

In *Coe* v. *Commonwealth*, 231 Va. 83, 340 S.E.2d 820 (1986), we said that we will not reverse a conviction for admission of a potentially inflammatory statement absent a clear abuse of discretion. There was no such abuse in this case.

## C. *Defendant's "Last Minute" Decision Whether to Testify*

Bennett further argues that testimony concerning his statement should have been excluded because it improperly forced him to decide, at the last minute, whether to take the witness stand to explain his statement. We find no merit to this argument. The Commonwealth disclosed the statement well before the investigator testified and in ample time for Bennett's counsel to advise him whether or not to take the witness stand. In *United States* v. *Swacker*, 628 F.2d 1250 (9th Cir. 1980), the defendant complained in part that by using at trial certain of his testimony before the grand jury, he was forced to testify at trial in violation of his Fifth Amendment rights. The Ninth Circuit rejected that argument as follows: "The appellant's decision to testify in order to explain the prior testimony presents no different situation than where a defendant elects to take the stand to counter or explain incriminating evidence or testimony presented by an independent source." *Id.* at 1253. The same logic applies here. Bennett had ample time and opportunity to decide the best course for him to take with regard to taking the witness stand.

## VI. *Striking A Juror For Cause*

■ Bennett next contends that it was error to strike juror Hanks for cause. The question whether a particular juror is qualified to sit falls peculiarly within the province of the trial court. *See Watkins* v. *Commonwealth*, 229 Va. 469, 480, 331 S.E.2d 422, 431 (1985), *cert. denied*, 475 U.S. 1099 (1986). Deference must be paid to trial judges in deciding which juror will be unable to apply the law faithfully and impartially. *Wainwright* v. *Witt*, 469 U.S. 412, 426 (1985). The proof of a prospective juror's impartially must come from his own mouth, not from predictable responses to persuasive suggestions from the attorney who attempts to rehabilitate the prospective juror. *See Martin* v. *Commonwealth*, 221 Va. 436, 444, 271 S.E.2d 123, 129 (1980); *Breeden* v. *Commonwealth*, 217 Va. 297, 300, 227 S.E.2d 734, 736 (1976). The trial court's decision with regard to the qualification of a prospective juror will not be reversed absent a showing of manifest error. *See L. E. Briley* v. *Commonwealth*, 222 Va. 180, 185, 279 S.E.2d 151, 154 (1981).

Here, the prospective juror made clear that she would have to have "absolutely no doubt" that the defendant was the right person before she could vote to impose the death sentence. The trial court explained that the correct burden of proof was "beyond a reasonable doubt" and went on to explain the difference between "reasonable doubt" and "any doubt." The prospective juror said she understood the difference then she made this comment: "You're right. I see what you mean. I mean any doubt at all, there would have to be absolutely no doubt at all on that." The trial court was well within its discretion in excluding this prospective juror for cause.

## VII. *Limitations on Defendant's Voir Dire*

Bennett also contends that his voir dire was improperly limited because he was not permitted to use photographs of the victim to help determine whether the vileness of the crime would affect the prospective jurors' ability to give him a fair trial.

■ Questions asked on voir dire are subject to the control of the trial court. *Poyner* v. *Commonwealth*, 229 Va. 401, 414-15, 329 S.E.2d 815, 826, *cert. denied*, 474 U.S. 865, 474 U.S. 888 (1985); *Tuggle* v. *Commonwealth*, 228 Va. 493, 505, 323 S.E.2d 539, 546 (1984), *vacated on other grounds*, 471 U.S. 1096

(1985). No court is required to ask questions that are tied only speculatively to prejudice. *United States* v. *Click*, 807 F.2d 847, 850 (9th Cir. 1987).

In the instant case, the photographs the defendant sought to use had not been admitted into evidence. Further, the trial court permitted defense counsel to give a detailed oral description of the murder scene. Defendant fails to point to any place in the record which supports his view that the crime scene was so gory as to rob him of a fair trial. We hold that the trial court did not err in refusing to permit defendant to use photographs during voir dire.

## VIII. *Improper Closing Argument*

Bennett argues that the Commonwealth's Attorney, in his closing argument, made improper comments on defendant's failure to testify, argued concerning matters not in evidence, and misstated the facts. Bennett made six objections during the Commonwealth's closing argument. The matters objected to are asserted here as the bases for reversing Bennett's conviction. We have reviewed the closing argument and we find no instance in which the Commonwealth's Attorney commented on Bennett's failure to testify. The other matters, concerning the discussion of facts, were entirely inconsequential and could not have prejudiced Bennett. This assignment of error is completely without merit.

## IX. *Instructions on First Degree Murder and Grade of Offense*

Bennett also contends that he was entitled to an instruction on first degree murder and an instruction on determining the grade of the offense of homicide. He fails to point to any place in the record where evidence was adduced to support the grant of such instructions. He merely recites that a review of the record will reveal facts to support the proposed instructions.

Upon our review of the record, the only defense offered by Bennett was that he was not the killer. He adduced no evidence that the victim was not murdered during the commission of robbery. The defendant in *Frye* v. *Commonwealth*, 231 Va. 370, 345 S.E.2d 267 (1986), advanced a similar argument in support of a first degree murder instruction. What we said there applies here: "The sole issue presented by the evidence in this case was whether it was Frye . . . who killed the trooper. Frye was either guilty or

innocent of the capital offense, and he was not entitled to an instruction on first-degree murder." *Id.* at 389, 345 S.E.2d at 281. It follows from this ruling that Bennett was not entitled to an instruction on the grade of the offense of homicide.

## X. *Introduction of Photographs*

Bennett complains that certain photographs of the victim should not have been introduced into evidence. One photograph showed how the victim looked a month before she died. Others were taken at the crime scene. Still others were taken at the morgue. On brief, Bennett does not identify any of the photographs by exhibit number. Some objections by exhibit number were made in the record. We reject this argument.

We have said time and again that the admission of photographs into evidence rests within the sound discretion of the trial court. Here, Bennett simply asserts in conclusive fashion that the photographs he complains of were more prejudicial than probative. However, we have considered the photographs and the context in which they were admitted into evidence. Upon our review, we find no abuse of discretion by the trial court. *See, e.g., Watkins* v. *Commonwealth*, 229 Va. 469, 482, 331 S.E.2d 422, 433 (1985), *cert. denied*, 475 U.S. 1099 (1986); *Poyner* v. *Commonwealth*, 229 Va. 401, 417, 329 S.E.2d 815, 827, *cert. denied*, 474 U.S. 865, 474 U.S. 888 (1985); *Washington* v. *Commonwealth*, 228 Va. 535, 551, 323 S.E.2d 577, 588 (1984), *cert. denied*, 471 U.S. 1111 (1985); *Clanton* v. *Commonwealth*, 223 Va. 41, 51, 286 S.E.2d 172, 178 (1982). We hold that the trial court did not err in admitting into evidence the photographs generally complained of by Bennett.

## XI. *Statutory Review*

By statute, we are required to decide whether the death sentence was imposed under the influence of passion or prejudice, or whether it was excessive or disproportionate to the penalty imposed in other cases. Code § 17-110.1(C).

Bennett makes no claim that his death sentence was the result of passion or prejudice. From our independent review of the record, we find no such indication. We are of opinion that the penalty was not the result of the influence of passion or prejudice.

■ Nor do we think this sentence was excessive or disproportionate. We have considered other cases involving a charge of capital murder in the commission of robbery while armed with a deadly weapon and we are satisfied that juries in Virginia customarily impose the death sentence for a crime of this type based upon the vileness predicate. *Turner v. Commonwealth*, 234 Va. 543, 364 S.E.2d 483, *cert. denied*, 486 U.S. ___, 108 S.Ct. 1756 (1988) (vileness); *Correll v. Commonwealth*, 232 Va. 454, 352 S.E.2d 352, *cert. denied*, 482 U.S. 931, 107 S.Ct. 3219 (1987) (vileness); *Wise v. Commonwealth*, 230 Va. 322, 337 S.E.2d 715 (1985), *cert. denied*, 475 U.S. 1112 (1986) (vileness); *LeVasseur v. Commonwealth*, 225 Va. 564, 304 S.E.2d 644 (1983), *cert. denied*, 464 U.S. 1063 (1984) (vileness); *Bunch v. Commonwealth*, 225 Va. 423, 304 S.E.2d 271, *cert. denied*, 464 U.S. 977 (1983) (vileness).

## VII. *Conclusion*

For all the foregoing reasons, the judgments appealed from will be affirmed.

Record No. 880362 — *Affirmed.*
Record No. 880389 — *Affirmed.*