UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, AtLee and Chaney
Argued at Norfolk, Virginia

LAWRENCE ROOSEVELT SMITH

v.      Record No. 0560-21-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE RICHARD Y. ATLEE, JR.
APRIL 26, 2022

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Bryant L. Sugg, Judge

Catherine A. Tatum, Assistant Public Defender, for appellant.

Craig W. Stallard, Senior Assistant Attorney General (Mark R.
Herring,[1] Attorney General; Maureen E. Mshar, Assistant Attorney
General, on brief), for appellee.

Following a jury trial, the Circuit Court of the City of Newport News ("trial court")

convicted appellant Lawrence Roosevelt Smith of first-degree murder, in violation of Code

§ 18.2-32. He was sentenced to life imprisonment. On appeal, Smith contends that the trial court

erred by denying his motion for a mistrial based on alleged witness misconduct. He also argues that

the evidence was insufficient to prove premeditation. For the following reasons, we affirm the trial

court's judgment.

I. BACKGROUND

In accordance with familiar principles of appellate review, we state the facts "in the light

most favorable to the Commonwealth, the prevailing party at trial." *Gerald v. Commonwealth*, 295

Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)). In doing so, we

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

discard any of Smith's conflicting evidence, and we regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. *Id.* at 473.

On the afternoon of April 1, 2018, Smith ate Easter dinner at the apartment of his girlfriend, Laquita Ball, and her two children: Karon, an eighteen-year-old son; and J.B., a minor daughter. Laquita excused herself while her children were eating and went upstairs to shower in her bedroom's interior bathroom. While Laquita was upstairs, Smith remarked to the children that their mother was "not going to cook another big dinner like this in a while." J.B. and Karon napped after finishing their meal.

Around 4:00 p.m., J.B. and Karon awoke to their mother's screams coming from her bedroom. They hurried upstairs to find that two locks secured the bedroom door from the inside, forcing Karon to break through the door using a knife from the kitchen. Once inside the bedroom, J.B. and Karon discovered that the interior bathroom door was also locked. Dropping the knife, Karon "kicked the bathroom door open" to reveal Smith inside standing over Laquita, who was nude and "looked like [Smith] had tried to knock her out or something." Laquita implored her children to "get help" as she ran out of the bathroom and collapsed on the bedroom floor. Karon attempted to prevent Smith's escape, but Smith "rushed on [Karon]" after bursting from the bathroom. The two men "wrestl[ed]" until Smith "broke away," running downstairs and out the front door of the apartment.

J.B. saw Smith holding "something sharp" in his hand as he fled but was uncertain whether it was a knife. She observed injuries on her mother's chest and blood covering the bathroom's walls and floor; she did not see any injuries or blood on Smith. From an upstairs window, J.B. watched Smith get into a vehicle, which drove away. Karon called 911 and waited with his sister for police to arrive.

Taisha Price, Laquita's downstairs neighbor, called the police after hearing "crying and screaming" and people "running back and forth" in the apartment above her. She heard someone "run down the stairs" and saw Smith walk "right past [her] window" holding "something that looked like a screwdriver." Police arrived "about three or four minutes" later.

At 5:43 p.m., Newport News Police Officer Robert Potts arrived at the apartment to find people outside the building screaming and Karon and J.B. "screaming from [the] apartment crying for help" for their mother. In the upstairs bedroom, Potts found Laquita lying face down, "naked on the floor with blood on the floor and on her person." "[U]nresponsive but breathing," Laquita had a "stab wound on her back . . . and more stab wounds on her chest, and on her cheek and hands." Potts noticed a "butter knife on the floor" by the bathroom's entrance and "[a] lot of blood on the walls and on the sink, bathtub, the floor, pretty much everywhere in the bathroom." Potts rendered first aid and accompanied Laquita during transport to the hospital, where she was pronounced dead at 7:22 p.m.

Assistant Chief Medical Examiner Dr. Wendy Gunther, after being certified as an expert in forensic pathology, testified that she had performed an autopsy and concluded that Laquita died from "[s]tab wounds to the chest." Gunther observed that Laquita had "a lot of sharp force trauma," with "scattered [stab] wounds all over her [body]," including at least four to her chest and three to her cheek. Two of the cheek wounds "went through the mouth and may have knocked out one of [Laquita's] teeth." Two of the chest wounds were fatal, with one piercing the heart and the other a lung. Gunther observed that some of the stab wounds did not "look exactly like knife wounds." Based on their dimensions, she determined that the wounds were caused by an object "hit[ting] the body at different angles and sometimes it just skeered[2] off the skin and other times had gone all

_____

[2] From context, Gunther appeared to be describing the effect of a stabbing motion that did not directly land and fully puncture, but, rather, scraped or skimmed Laquita's skin.

the way in." Gunther could not determine what specific implement caused Laquita's injuries or whether her attacker used a single weapon. Nonetheless, she concluded that some of the stab wounds could have been inflicted with "the typical kitchen knife or combat knife," others could have been from a "screwdriver" or similar object, and all the wounds "looked like they were [caused by a] 3/8 by 3/8 instrument that left the kind of star-shape, cross-shape mark."

Gunther also discovered evidence of "defensive wounds" and "blunt force trauma" on Laquita's body. She explained that several of the stab wounds to Laquita's hands and forearms were typical of a person "trying to fend off the attack of an object." Gunther also testified that contusions patterned Laquita's arms in the "same distribution as you would expect if someone had grabbed a person and held them hard enough to bruise them in areas unlikely to occur from a fall." Additionally, from marks and bruising on Laquita's face and neck, Gunther concluded that "somebody may have grabbed her by the throat hard enough to bruise her."

Police gathered evidence at the apartment following Laquita's death. Inside the bathroom, police discovered knives, scissors, a pen, and Laquita's clothing. In the bedroom, police found a knife handle on the bed, a tool bag containing several screwdrivers, and a long screwdriver on top of the dresser.

Smith was arrested on the same day as the incident. At the station, in the interview room, police photographed his left hand, which "was still bleeding fairly quickly" under a bandage. Smith explained that he "got a little cut." Smith told Detective Thornton, who interviewed him at the station, that he had been dating Laquita for the past year and that they had argued the previous Saturday regarding her relationship with a former lover. The week before, he had confronted Laquita about "talking to [the other man] on the phone." During the ensuing argument, Laquita told Smith that the other man "got her heart and she still have [sic] his." Smith told Laquita "[he]

wanted to kill [him]self . . . on the bed." He claimed that, leading up to Easter, he and Laquita were "still together" but he had "thoughts goin' through [his] head."

Smith admitted that he was sitting beside Laquita's bed after Easter dinner when he overheard her in the bathroom "talkin' to [the other] dude on the phone" and that this had "kinda bothered [him] all week." He confessed that overhearing Laquita's conversation "made a part of [him], ain't never came out before," explaining that "the bad side of [him]" emerged after "[he] kept him locked up a long time." Smith admitted that he "should've just walked away and went to the gym." Instead, he retrieved a kitchen knife, because he "wanted jus[t] to scare [Laquita] with the knife." Then "it went too far." Smith described how, knife in hand, he entered the bathroom and accosted Laquita in the shower. Smith claimed that he pushed Laquita down into the bathtub "just [to] scare her" as she cried out, "[n]o Lawrence, it's, it's nothing like that, it's nothing like that."

Although Smith initially claimed that he could not recall stabbing Laquita, he later admitted that he began "pokin' her" with at least two jabs of the knife until the blade "broke inside her." Afterward, he cut his hand in the bathroom somehow when Karon "tried to come in, pushed the door and grabbed the knife." Smith then discarded the broken knife handle in the bedroom, exited the apartment, and "flag[ged] down a ride" to his cousin's house. Smith told Thornton that he changed his clothes and discarded his outfit into a dumpster before walking to a Walmart, where he called his sister. After learning from his sister that Laquita had died, he confessed to his sister, "I messed up." He then "turn[ed] [himself] in" to police, although he had contemplated slitting his wrist with a boxcutter.

At trial, Smith testified that he intended "just to scare" Laquita with the knife, but he "went too far." He admitted that he locked the bedroom door behind him before cornering Laquita in the bathroom but denied locking the bathroom door. Smith claimed that both Karon and J.B. were armed with knives as they attempted to defend their mother, but he disarmed them, cutting his left

hand on Karon's blade in the process. He denied using a screwdriver or changing his clothes to conceal his identity; rather, he testified that he used a knife, but dropped it in the bathroom during the attack, and he changed his outfit afterward only because he was covered in his own blood. He admitted that he stabbed Laquita "three times" in the stomach. He testified that he thought to himself that he "shouldn't have did it" after stabbing Laquita the first time, yet he continued to stab her two more times. He also admitted that he stabbed Laquita a third time despite realizing she was injured after the second thrust. Moreover, Smith acknowledged that he stabbed Laquita "so far that [he] broke the blade of [the] knife." While he repeatedly testified that he either did not "know" or "remember" what he was thinking throughout the attack, he understood that he had "killed somebody."

On the second day of Smith's two-day jury trial, the Commonwealth alerted the court and defense counsel that a member of the Commonwealth's victim-witness office saw J.B. leave the witness room to listen "through the door" of the courtroom during trial. The trial court previously had ordered all witnesses separated and sequestered, including J.B. J.B. had given her complete testimony during the first day of the trial. Nevertheless, the Commonwealth conceded that J.B. had violated the trial court's sequestration order. Consequently, the Commonwealth intended to release J.B. as a witness and not recall her in rebuttal.

Smith moved for a mistrial and asked the court to hold J.B. in contempt of court, expressing concern that J.B. may have "imparted information that she gleaned" from listening to the trial to her brother, Karon, who had yet to testify. The Commonwealth contended, "I don't think it's tainted the trial at this point since she has not been recalled and Karon has not been called as a witness so far."

Outside of the presence of the jury, the trial court placed Karon under oath to "find out whether or not [he had] talked to [J.B.] about the incidents of the trial . . . ." Karon agreed that, in

the time since the trial court placed him under oath the previous day, he had not "had any conversations" with J.B. "about what she may have testified [to] or anything about what she may have heard" during the trial. In fact, he had not "talked to anybody about it and nobody's talked to [him]." During the defense's cross-examination, Karon agreed that he and J.B. were not "staying together," he lived "in a separate location," and he "didn't speak with [J.B.] at all yesterday[.]" At the conclusion of Karon's testimony, the trial court remarked: "All right. I think that addresses that issue. Unless there's something else?" Defense counsel responded, "No. I believe that actually addressed that particular issue."

Based on Karon's testimony, the trial court denied the motion for mistrial, finding that "if we're not recalling [J.B.] then I think the testimony of her brother cures the issue [because] there wasn't any talk between them. And it's more compelling too that they weren't even staying together, maybe." Defense counsel noted his objection to the trial court's ruling. Ultimately, the jury found Smith guilty of first-degree murder, and the trial court denied Smith's subsequent motion to set aside the verdict. This appeal follows.

## II. ANALYSIS

Smith argues that the trial court erred in denying his motion for mistrial based on alleged witness misconduct. He further contends that the evidence failed to prove premeditation. We consider each argument in turn.

*A. The trial court did not abuse its discretion in denying Smith's motion for mistrial.*

Smith asserts that the trial court erred in denying his motion for mistrial based on J.B.'s misconduct because the court effectively deprived Smith of a fair opportunity to present his theory of the case. He contends that J.B. intentionally violated the trial court's sequestration order, preventing her from being recalled as a witness and prompting the Commonwealth to deliberately forego Karon's testimony. As a result, Smith claims that he was unable to cross-examine Karon

during the Commonwealth's case, or call J.B. during the presentation of his case, thereby preventing him from exploring his theory that the siblings caused the victim's injuries. Furthermore, Smith argues for the first time on appeal that the trial court abused its discretion by making inadequate factual inquiries regarding the details of J.B.'s misconduct. We disagree.

On appeal, "[w]e review [a trial court's] denial of a motion for a mistrial for abuse of discretion." *Bethea v. Commonwealth*, 68 Va. App. 487, 500 (2018) (first alteration in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 220 (2013)). "A reviewing court can conclude that 'an abuse of discretion has occurred' only in cases in which 'reasonable jurists could not differ' about the correct result." *Id.* at 506-07 (quoting *Commonwealth v. Swann*, 290 Va. 194, 197 (2015)). "'[B]y definition,' however, a trial court 'abuses its discretion when it makes an error of law.'" *Id.* at 507 (quoting *Coffman v. Commonwealth*, 67 Va. App. 163, 166 (2017)). "To properly review the trial court's application of the law to the facts, '[w]e give deference to the trial court's factual findings and view the facts in the light most favorable to . . . the prevailing part[y] below.'" *Stone v. Commonwealth*, 297 Va. 100, 102 (2019) (alterations in original) (quoting *Kim v. Commonwealth*, 293 Va. 304, 311 (2017)).

"When a motion for mistrial is made, based upon an allegedly prejudicial event, the trial court must make an initial factual determination, in . . . light of all the circumstances of the case, whether the defendant's rights are so 'indelibly prejudiced' as to necessitate a new trial." *Spencer v. Commonwealth*, 240 Va. 78, 95 (1990) (quoting *LeVasseur v. Commonwealth*, 225 Va. 564, 589 (1983)). "The trial court must also find a probability of prejudice, with the 'burden of establishing that probability . . . upon the party moving for a mistrial.'" *Green v. Commonwealth*, 26 Va. App. 394, 401 (1998) (alteration in original) (quoting *Robertson* v. *Metropolitan Washington Airport Auth.*, 249 Va. 72, 76 (1995)). "Hence, we will not overturn 'the denial of a motion for a mistrial

. . . unless there exists a manifest probability that [the ruling] was prejudicial.'" *Id.* (alterations in original) (quoting *Taylor v. Commonwealth*, 25 Va. App. 12, 17 (1997)).

"A trial court has discretion to decide whether a witness who violates an exclusion order should be prevented from testifying." *Bennett v. Commonwealth*, 236 Va. 448, 465 (1988). "It is also pertinent whether the out-of-court comments concerned any substantive aspect of the case and whether they had any effect on the witness'[s] testimony." *Id.* "Factors to be considered in resolving the question include whether there was prejudice to the defendant and whether there was intentional impropriety attributable to the prosecution." *Ndunguru v. Commonwealth*, 73 Va. App. 436, 442 (2021) (quoting *Bennett*, 236 Va. at 465). "It is also pertinent whether the out-of-court comments concerned any substantive aspect of the case and whether they had any effect on the witness'[s] testimony." *Bennett*, 236 Va. at 465. "[T]he purpose of excluding the witnesses from the courtroom is, of course, to deprive a later witness of the opportunity of shaping his testimony to correspond to that of the earlier one." *Ndunguru*, 73 Va. App. at 442 (quoting *Bennett*, 236 Va. at 465). "Without adulteration there can be no prejudice to a defendant." *Id.*

Here, it is undisputed that J.B. violated the trial court's rule on witnesses. The question, then, is whether that circumstance created a "manifest probability" that the trial court's denial of the motion for mistrial prejudiced Smith. We conclude that no such probability of prejudice exists.

Assuming, without deciding, that J.B.'s misconduct was "intentional" and "attributable to the Commonwealth," there is no evidence that it tainted or otherwise affected any witness testimony. J.B. had given her complete testimony before she violated the court's witness separation order. Neither J.B. nor Karon testified in front of the jury after J.B. violated the order. Thus, there was no "opportunity" for either witness to "shap[e] his [or her] testimony to correspond to that of [an] earlier [witness]." *Id.* (quoting *Bennett*, 236 Va. at 465).

Moreover, the trial court properly conducted a factual inquiry to ascertain whether J.B.'s misconduct tainted Karon's anticipated testimony. Examined outside the jury's presence by both litigants, and the trial court, Karon testified that he did not discuss the incidents of trial with anyone, much less J.B. From that testimony, the trial court found that "there wasn't any talk between [J.B. and Karon]" and reasonably concluded that "if we're not recalling [J.B.] then I think the testimony of her brother cures the issue . . . ." Thus, giving "deference to the trial court's factual findings" and viewing the facts "in light most favorable to [the Commonwealth]," we cannot say that the trial court abused its discretion in denying Smith's motion for mistrial, as there was no prejudice to him. *Stone*, 297 Va. at 102 (quoting *Kim*, 293 Va. at 311).

Notwithstanding the above, Smith argues that the trial court's ruling prejudiced him by effectively preventing him from presenting his theory of the case—namely, that J.B. and Karon inflicted the injuries to Laquita after he fled. Smith contends that J.B.'s misconduct precluded Smith from calling her to testify in his case-in-chief and prompted the Commonwealth to deliberately avoid summoning Karon as a witness to prevent his cross-examination. The record, however, does not support Smith's claims. The trial court never barred J.B. or Karon from testifying, and Smith never attempted to call either witness to elicit his desired testimony, despite having the opportunity to do so.

Finally, we find that Smith failed to preserve for appellate review his remaining argument that the trial court abused its discretion by making inadequate factual inquiries regarding J.B.'s misconduct. Specifically, Smith contends that because the trial court never questioned J.B. or the victim-witness advocate regarding the details of J.B.'s misconduct, "[t]he court did not have enough information about the specific circumstances surrounding [J.B.'s] actions" to intelligently rule on the motion for mistrial.

Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Accordingly, "this Court 'will not consider an argument on appeal [that] was not presented to the trial court.'" *Farnsworth v. Commonwealth*, 43 Va. App. 490, 500 (2004) (alteration in original) (quoting *Ohree v. Commonwealth*, 26 Va. App. 299, 308 (1998)). Moreover, appellate courts "will not consider an argument that differs from the specific argument presented to the trial court, even if it relates to the same general issue." *Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (*en banc*) (citing *Floyd v. Commonwealth*, 219 Va. 575, 584 (1978)). "Not just any objection will do. It must be both *specific* and *timely*—so that the trial judge would know the particular point being made in time to do something about it." *Bethea*, 297 Va. at 743 (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)).

At trial, the court provided both litigants an opportunity to examine Karon to determine whether J.B.'s misconduct compromised him as a witness. After Karon's questioning, the trial court stated, "All right. I think that addresses that issue. Unless there's something else?" By replying, "No. I think that addresses that," Smith waived the opportunity to examine additional witnesses to meet his burden of establishing "a probability of prejudice," and with it his argument on appeal. *Green*, 26 Va. App. at 401. In addition, Smith never argued to the trial court that the court's factual inquiry was deficient, or that it needed to examine J.B. *See Edwards*, 41 Va. App. at 760 ("Making one specific argument on an issue does not preserve a separate legal point on the same issue for review."). Accordingly, Rule 5A:18 forecloses our review of the argument Smith raises for the first time on appeal. Although there are exceptions to Rule 5A:18, Smith has not invoked them, and the Court does not do so *sua sponte*. *Id*. at 761.

*B. The jury's finding that Smith acted with premeditation was neither plainly wrong nor without evidentiary support.*

Smith argues that the evidence was insufficient to prove that he acted with the premeditation necessary to sustain a conviction for first-degree murder. He contends that he only intended "to scare" the victim, not kill her.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "[T]he relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

"To premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second degree murder." *Kirby v. Commonwealth*, 50 Va. App. 691, 700 (2007) (quoting *Remington v. Commonwealth*, 262 Va. 333, 352 (2001)); *see also* Code § 18.2-32. "The intention to kill need not exist for any specified length of time prior to the actual killing; the design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Avent v. Commonwealth*, 279 Va. 175, 208 (2010) (quoting *Remington*, 262 Va. at 352). "[I]t is necessary that the killing should have been done on purpose and not by accident or without design." *Aldridge v. Commonwealth*, 44 Va. App. 618, 655 (2004) (quoting *Epperly v. Commonwealth*, 224 Va. 214, 231 (1982)).

Whether a defendant committed a "willful, deliberate, and premeditated" killing is a question of fact for the jury to determine. *Epperly*, 224 Va. at 231-32. In deciding whether a defendant acted with premeditation,

> the jury may consider the brutality of the attack, and whether more than one blow was struck, the disparity in size and strength between the defendant and the victim, the concealment of the victim's body, and the defendant's lack of remorse and efforts to avoid detection.

*Avent*, 279 Va. at 208 (quoting *Epperly*, 224 Va. at 232). "Also, although 'motive is not an essential element of the crime, it is relevant and often most persuasive upon the question of the actor's intent.'" *Aldridge*, 44 Va. App. at 656 (quoting *Epperly*, 224 Va. at 232). Moreover, "evidence of a mortal wound inflicted by a deadly weapon with little or no provocation creates an inference from which the trier of fact may conclude that the killer acted with premeditation." *Morris v. Commonwealth*, 17 Va. App. 575, 578 (1994). "Taking the steps necessary to locate and obtain a weapon further bolsters the inference of malice." *Id.* The existence of each of these circumstances, however, is not required before a jury may find that premeditation existed. *Rhodes v. Commonwealth*, 238 Va. 480, 487 (1989). Rather, "any one of these circumstances standing alone might [be] sufficient" in a given case. *Kirby*, 50 Va. App. at 702.

The record amply supports the jury's finding that Smith killed Laquita with premeditation. After overhearing Laquita speaking to another man in her bathroom, Smith "t[ook] the steps necessary to locate and obtain a weapon," *Morris*, 17 Va. App. at 578, locked the bedroom door behind him, and repeatedly stabbed Laquita with a deadly weapon as she stood naked and defenseless in her bathroom. Smith admitted that, as he stabbed Laquita, he thought to himself that he "shouldn't have did it," yet he continued to stab her two more times. Further, he admitted that he stabbed Laquita a third time despite realizing she was already wounded.

- 13 -

Together, that evidence clearly established that Smith had "time to think and did intend to kill."
*Avent*, 279 Va. at 208 (quoting *Remington*, 262 Va. at 352).

In addition, the evidence demonstrated that Smith callously disregarded Laquita's desperate attempts to calm him as he fatally punctured her heart and lung, stabbing so ferociously that he broke the blade inside her body. By his own admission, Smith ignored the victim's pleas of help, violently repelled her children's rescue attempt, fled the apartment to change his clothes, and abandoned his victim in a pool of blood while fully aware that she had suffered at least three injuries. That evidence, manifesting the sheer "brutality of the attack" and Smith's "lack of remorse and efforts to avoid detection," provides compelling support for the jury's finding of premeditation. *Id.* (quoting *Epperly*, 224 Va. at 232).

Notwithstanding the above, Smith, citing his own testimony, argues that the evidence proved that he only intended "to scare" the victim rather than kill her. In essence, he asks this Court to reassess witness credibility, credit his testimony, and adopt his hypothesis of innocence, thereby reassessing factual issues that the fact finder considered and rejected. We decline to do so.

"Determining the credibility of witnesses . . . is within the exclusive province of the jury, which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (alteration in original) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). "[T]he conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only when we find that the witness'[s] testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ragsdale v. Commonwealth*, 38 Va. App. 421, 429 (2002) (quoting *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000)). Moreover, "[w]hether [a] hypothesis of innocence is reasonable is itself a 'question of fact,' subject to deferential appellate review." *Haskins v. Commonwealth*, 44

- 14 -

Va. App. 1, 9 (2004) (citation omitted) (quoting *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004)).

Further, "[i]n its role of judging witness credibility," the jury was "entitled to disbelieve the self-serving testimony of the accused and to conclude that [he was] lying to conceal his guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)). And it was the jury's prerogative to accept portions of Smith's testimony as true while discarding the balance as implausible. *See Parham v. Commonwealth*, 64 Va. App. 560, 565 (2015) (observing that a "fact finder is not required to believe all aspects of the testimony of a witness . . . [and] may 'accept the parts of a witness'[s] testimony it finds believable and reject other parts as implausible'" (quoting *Moyer v. Commonwealth*, 33 Va. App. 8, 28 (2000) (*en banc*)). Given the overwhelming evidence of premeditation presented at trial, we decline to overturn the jury's credibility determinations as they were neither plainly wrong nor without evidentiary support, and it was entitled to reject Smith's proffered theory of innocence. *See Mosby v. Commonwealth*, 168 Va. 688, 695 (1937) (rejecting the defendant's theory that he merely intended "to scare" victim where there was evidence of premeditation). Thus, the trial court did not err in accepting the jury's finding that the evidence was sufficient to support Smith's conviction.

III. CONCLUSION

For the foregoing reasons, we affirm Smith's first-degree murder conviction.

*Affirmed.*

- 15 -