COURT OF APPEALS OF VIRGINIA

Present: Judges Athey, Friedman and Raphael
Argued at Richmond, Virginia


WILLIAM HARRY ROBERTS

                                                    MEMORANDUM OPINION* BY
v.         Record No. 0180-23-2                     JUDGE STUART A. RAPHAEL
                                                          APRIL 16, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF LUNENBURG COUNTY
J. William Watson, Jr., Judge

Samantha Offutt Thames, Senior Assistant Public Defender (Virginia
Indigent Defense Commission, on briefs), for appellant.

Robert D. Bauer, Assistant Attorney General (Jason S. Miyares,
Attorney General; Leah A. Darron, Senior Assistant Attorney
General, on brief), for appellee.


After holding his mother-in-law at knifepoint and threatening to dismember her, William

Harry Roberts was convicted of various crimes. He challenges only his convictions for

attempted murder, robbery, and abduction. We reject his claim that the Commonwealth failed to

prove that he committed those offenses. And we find unpersuasive his challenges to two

evidentiary rulings. The trial court did not abuse its discretion by admitting into evidence

Roberts's recorded jailhouse call with his estranged wife in which Roberts admitted wrongdoing

and pressed her to help dismiss the charges. We reject his argument that the call was

inadmissible because it showed he was in jail. We likewise find no abuse of discretion in the

trial court's admitting the recording of the 911 call in which the wife reported her mother's

abduction. Roberts argues that the tape was exculpatory and should have been produced earlier

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

than several days before trial. But he conceded that the prosecutor turned over the recording as soon as she had it. And Roberts declined the trial court's offer of a continuance if Roberts needed more time. So we affirm his convictions.

BACKGROUND

On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires that we "discard" the defendant's evidence when it conflicts with the Commonwealth's evidence, "regard as true all the credible evidence favorable to the Commonwealth," and read "all fair inferences" in the Commonwealth's favor. *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

In 2020, Roberts and his wife, T.R. ("wife"), had been married for 20 years and were living together in Lunenburg County. Wife's mother, P.W.B. ("mother"), moved in with the couple in October 2020. Mother's leg had been amputated, and she used a motorized wheelchair for mobility.

Roberts's relationship with wife was deteriorating when mother moved in with them. Roberts was "[s]uper controlling" and "monitor[ed]" everything wife was doing. Wife and mother walked on "pins and needles" around him. They "couldn't speak, couldn't laugh, couldn't play with [their] phones" for fear that Roberts would snap into a rage.

In late November, wife told Roberts that she wanted a divorce. In December, Roberts moved out of the house and into a hotel. He was angry and "[r]eligiously" texted wife, sometimes using other people's phones to contact her because he knew she wouldn't answer his call. Sometimes wife responded. Sometimes she ignored his messages and calls. She felt

"overwhelm[ed]." Around Christmas, wife moved out of the house and in with her boyfriend. Mother stayed in the home alone, feeling ready to be more independent.

Roberts repeatedly called wife on Christmas day. She answered once but hung up another time after he started "cussing" at her. Roberts repeatedly texted her. When she did not respond, he sent her a picture of a knife, texting that he was "done talking." Wife was "unnerved" by the texts. She worried about her mother staying alone in the house. Wife invited mother to stay with her instead, but mother declined.

On the night of December 26, mother developed a "terrible feeling" that if she dozed off, Roberts would kill her in her sleep. So mother avoided bed, remaining in her wheelchair. Mother stayed up all night. By dawn on December 27, she was weary. Feeling safer that it was light out, mother put down her phone and started to move from her wheelchair to the bed. She had one leg out of the wheelchair when Roberts burst through her bedroom door, knife in hand. "[T]his is your day to die," he said.

Roberts grabbed mother's phone. Then he disengaged the joystick on her wheelchair and assumed control over it.[1] Roberts wheeled her into the living room and locked the wheelchair in place. Mother pleaded, "[W]hy are you doing this, . . . I've always treated you like a son." Roberts answered that wife "took his world," so "he's taking hers."

Roberts badgered mother about where wife was living and with whom. He scrolled through mother's cellphone messages and accused her of lying about wife's whereabouts. Roberts grew enraged. His forehead turned red. Mother feared for her life.

---

[1] The wheelchair's occupant uses a joystick to control it. The joystick is disengaged by flipping two levers on the back. When that happens, the user can no longer control the chair, but someone else can push the chair from behind.

Roberts used mother's phone to call wife. Wife answered, thinking it was mother, but wife realized that Roberts had broken into the home. Wife demanded that Roberts give the phone back to mother and leave. But Roberts refused.

Roberts asked wife where she was; she said it was "none of his business." Roberts swore at her and warned, "[I]t's going to be your business because I have your mother and I'm going to kill her." He said that "he had lost something that he loved," so wife would lose something she loved too.

When asked what he meant, Roberts said he "was going to start cutting" off mother's toes on her remaining leg. Mother's bare foot lay exposed on the wheelchair footrest. Roberts placed the blade of his knife between mother's toes and then moved the knife to the top of her foot. He warned wife she had 15 minutes to get there before he would "start with the toes," then cut off mother's "foot," then her "leg, and then . . . her head." Wife heard mother screaming, "he's really gonna do it"!

Wife told Roberts she could not get there that fast because she was in Farmville, more than an hour away. Roberts responded he had "masturbated fifteen times in the hotel and that wasn't enough," so when wife got there, he was "going to rape [her] anally and then kill [her]." He threatened to slit her throat. Over the phone, wife heard mother crying and begging Roberts not to hurt her.

Wife called 911 and reported that Roberts was holding mother "hostage at knife point and was going to kill her."[2] Multiple law-enforcement officers arrived at the home: Sergeant Brian

---

[2] Wife couldn't recall if she used two phones to remain on the line with Roberts and call 911, or if she put Roberts on hold to call 911 and then merged the calls. Wife testified that she remained on the phone with the dispatcher until after the incident was over. But the recording of her 911 call indicates that the call ended after wife relayed the information to the dispatcher.

- 4 -

Burns from the Lunenburg County Sheriff's Office, and Trooper Benjamin Rhodes and Sergeant Keith Pearce from the Virginia State Police.

After opening the front door a crack and seeing a police car, Roberts became enraged, "swearing and cussing" at wife for calling the police. He said that he and mother would not "make it out alive." Wife tried to reason with him, urging that he turn himself in, but Roberts wouldn't listen. Wheeling mother from the living room to the dining room, Roberts took up a defensive position behind her. He held the knife in one hand and used his other to control her head by grabbing her hair.

Sergeant Pearce and Trooper Rhodes approached the front door and knocked. They heard yelling inside. Roberts threatened to cut mother's throat if they came in. Mother yelled that Roberts was holding a knife to her throat. Roberts shouted at them, "get the f--- out."

The officers stayed on the front porch and called for a "tact team" and hostage negotiators. But before anyone else could get there, the officers heard more screaming from inside. Trooper Rhodes believed that Roberts was trying "to cut [mother's] throat or to harm her." Sergeant Burns kicked in the door, taser in his hand, leading the other officers inside.

Burns saw mother in the wheelchair with Roberts standing right behind her, "something silver" in his hand. Burns tased him. When Roberts fell to the floor, Burns saw the silver object fly out of his hand. Roberts resisted as the officers tried to place him in handcuffs. He cursed at them and tried to goad them into shooting him.

After Roberts was handcuffed, Burns turned to mother. She was "very distraught," and her neck was wounded. It appeared that some skin had been sliced off. Burns recovered a silver knife with a red handle on the floor where he had tased Roberts. Roberts was taken into custody.

While being held in the county jail, Roberts called wife on a recorded telephone line. An automated voice identified that the call was coming from an inmate. Roberts apologized to wife

for what he had done. He said he would "move away" and asked wife and mother to "get the charges dropped." The call lasted 6 minutes and 29 seconds.

The grand jury indicted Roberts on charges of abduction by force, attempted malicious wounding, attempted assault and battery of a law enforcement officer, attempted murder, robbery, using profane language over public airways, and multiple counts of violating a protective order. Before trial, Roberts moved to exclude the recording of the jailhouse telephone call on the ground that it "needlessly" revealed that he was incarcerated. The trial court denied the motion.

Roberts also moved to exclude the recording of the 911 call, arguing that it was provided to defense counsel "less than five business days from trial." Roberts conceded, however, that the prosecutor had given him the recording "the minute she had it." The Commonwealth responded that the contents of the 911 call were no surprise to Roberts. The substance had been "largely summarized" in statements provided to Roberts from the responding officers and from wife. The trial court denied the motion.

A three-day jury trial began on March 1, 2022. After the trial court denied his motion to strike, Roberts called Sergeant Burns as an adverse witness and rested. The trial court denied Roberts's renewed motion to strike. The jury found Roberts guilty of attempted murder, abduction, robbery, and making threats over the phone. Roberts later pleaded no-contest to attempted assault and battery of a law-enforcement officer and to two violations of a protective order. The trial court sentenced Roberts to 35 years and 36 months of incarceration, with 25 years and 36 months suspended, for an active sentence of 10 years. Roberts noted a timely appeal.

ANALYSIS

Roberts challenges only his convictions for attempted murder, robbery, and abduction.

He raises five assignments of error.

A.  *The phone call from jail (Assignment of Error I)*

The "'admissibility of evidence is within the discretion of the trial court,' and an

appellate court will not reject such decision absent an 'abuse of discretion.'"  *Williams v.*

*Commonwealth*, 71 Va. App. 462, 487 (2020) (quoting *Tirado v. Commonwealth*, 296 Va. 15, 26

(2018)).  A trial court "by definition abuses its discretion when it makes an error of law."

*Landrum v. Chippenham & Johnston-Willis Hosps., Inc.*, 282 Va. 346, 357 (2011).  We review

constitutional issues presenting questions of law de novo.  *Ali v. Commonwealth*, 75 Va. App.

16, 33 (2022).

Roberts argues that the trial court erred by admitting into evidence the recording of his

telephone call to wife from jail.  Roberts relies on *Estelle v. Williams*, 425 U.S. 501 (1976),

where the Supreme Court held that it would violate a defendant's right to a fair trial under the

Fourteenth Amendment to force a defendant to appear in prison garb during a jury trial.  *Id.* at

504-05.  Roberts argues that the telephone recording revealed to the jury that he was in jail when

he called wife, so the recording should have been excluded.

The analogy to *Estelle* is unpersuasive.  *Estelle* hinged on the need to ensure the

presumption of innocence by "carefully guard[ing] against dilution of the principle that guilt is to

be established *by probative evidence* and beyond a reasonable doubt."  *Id.* at 503 (emphasis

added).  How the defendant is dressed during his jury trial is irrelevant to whether he committed

the offenses charged.  Thus, "compelling an accused to wear jail clothing furthers no essential

state policy."  *Id.* at 505.  Worse, the defendant's jail "clothing is so likely to be a continuing

influence throughout the trial that . . . an unacceptable risk is presented of impermissible factors coming into play." *Id.*

Those considerations do not justify excluding the recording of Roberts's incriminating telephone call to wife from jail. Unlike the irrelevance of a defendant's courtroom attire, this call was "probative evidence," *id.* at 503, of Roberts's consciousness of guilt. Roberts told wife he was sorry, acknowledged "it's my fault," and asked wife and mother to "drop the charges." He admitted, "I made a big mistake and I know I did and I'm really really sorry for it." And unlike the concern in *Estelle* about a defendant's appearing in prison garb throughout trial, a "constant reminder" to the jury of his incarceration, *Estelle*, 425 U.S. at 504, the jail references in this recording were intermittent and fleeting. We see nothing in *Estelle* that would require trial courts to exclude a defendant's incriminating statements whenever they are made in a telephone call in which the defendant's incarcerated status is apparent. Moreover, Roberts did not request a limiting instruction about the jail references, nor did he argue that the jail references could and should have been redacted.

In short, because Roberts's statements on the call to his wife from jail were probative of guilt, the trial court did not abuse its discretion in admitting the recording into evidence.

### B. The 911 call (Assignment of Error II)

Roberts argues that the recording of the 911 call should have been excluded as a "late disclosure" in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. To constitute a *Brady* violation, however, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and

prejudice must have ensued."  *Coley v. Commonwealth*, 55 Va. App. 624, 631 (2010) (quoting

*Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  The defendant bears the burden to establish a

*Brady* violation.  *Skinner v. Switzer*, 562 U.S. 521, 536 (2010).

Roberts argues that the recording of the 911 call was exculpatory and usable as

impeachment material because wife "had been saying that she was in a hotel, not at her

boyfriend's house in Cumberland," from where she placed the call.  We assume without deciding

that the recording qualifies as impeachment evidence under *Brady*.[3]  Even so, Roberts failed to

carry his burden to show that the late disclosure resulted in prejudice.

"*Brady* is not violated, as a matter of law, when impeachment evidence is made

'available to [a] defendant[] during trial' if the defendant has 'sufficient time to make use of [it]

at trial.'"  *Commonwealth v. Tuma*, 285 Va. 629, 635 (2013) (alterations in original) (quoting

*Read v. Va. State Bar*, 233 Va. 560, 564-65 (1987)).  "It is the defendant's ability to utilize the

evidence at trial, and not the timing of the disclosure, that is determinative of prejudice."

*Moreno v. Commonwealth*, 10 Va. App. 408, 417 (1990).  There is no prejudice when the

Commonwealth discloses the evidence as soon as it receives it or when evidence is disclosed "in

time to be put to use."  *Bennett v. Commonwealth*, 236 Va. 448, 467 (1988).  And "a defendant

who 'failed to move for a continuance or even for a recess in order to consider the material'

untimely disclosed by the prosecution w[ill] not 'be heard to complain that he had insufficient

time to prepare for trial.'"  *Tuma*, 285 Va. at 637 (quoting *Frye v. Commonwealth*, 231 Va. 370,

384 (1986)).

Applying those standards, we find no abuse of discretion here.  Roberts conceded that the

prosecutor disclosed the recording of the 911 call as soon as she had it, and Roberts already had

---

[3] This Court need not "reach the issue of materiality" under *Brady* "unless we first
determine that the evidence was not available" to Roberts.  *Porter v. Warden of the Sussex I
State Prison*, 283 Va. 326, 332 (2012).

a written summary. Roberts argues that he did not have "the exact words" that wife used or the location data that came with the recording. But Roberts had the recording before trial, "in time [for it] to be put to use." *Bennett*, 236 Va. at 467. What is more, he "did not request either a postponement or a continuance." *Tuma*, 285 Va. at 637 (quoting *Davis v. Commonwealth*, 230 Va. 201, 204 (1985)). Indeed, he turned down the offer of a continuance, insisting without sound basis that the 911 call should be excluded altogether. Thus, the trial court acted well within its discretion to deny that request and admit the recording.

### C. The sufficiency of the evidence (Assignments of Error III-V)

Roberts challenges the trial court's denial of his motion to strike the charges for attempted murder, robbery, and abduction. We must "uphold the judgment of the trial court unless it is plainly wrong or without evidence to support it." *Moore v. Commonwealth*, 59 Va. App. 795, 804 n.4 (2012). As noted at the outset, we take the facts in the light most favorable to the Commonwealth and resolve all reasonable inferences in the Commonwealth's favor as well. *Cady*, 300 Va. at 329; *Hammer*, 74 Va. App. at 231. "The relevant issue on appeal is, 'upon review of the evidence in the light most favorable to the prosecution, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Lambert v. Commonwealth*, 298 Va. 510, 515 (2020) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)).

### Attempted murder

A conviction for attempted murder requires proof that the defendant possessed the specific intent to kill the victim and took an overt act toward doing so. *Secret v. Commonwealth*, 296 Va. 204, 228 (2018). "Whether the intent required for attempted murder exists 'is generally a question for the trier of fact.'" *Id.* (quoting *Nobles v. Commonwealth*, 218 Va. 548, 551 (1977)). "It is permissible for the fact finder to infer that every person intends the natural,

probable consequences of his . . . actions." *Ellis v. Commonwealth*, 281 Va. 499, 507 (2011). "[A]n overt act is any 'act apparently adopted to produce the result intended' so long as that act is not 'mere preparation.'" *Commonwealth v. Herring*, 288 Va. 59, 78 (2014) (quoting *Martin v. Commonwealth*, 195 Va. 1107, 1110-11 (1954)).

There was ample evidence here from which the jury could conclude that Roberts intended to kill his mother-in-law. He stormed into her bedroom with a knife in his hand and said, "this is your day to die." Roberts then disengaged her wheelchair and moved her into the living room, where he called wife and repeated his threats to kill mother. Roberts held his knife between mother's toes, threatening to dismember her from the toes on up. When the police arrived, Roberts threatened that he would "cut her throat" if they came in. He even sliced off some of mother's skin from her neck. A reasonable trier of fact could conclude from that evidence that Roberts had the specific intent to kill his mother-in-law and that he made an overt act toward that goal.

*Robbery*

Robbery is a common law crime against the person. It means "the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation." *Pierce v. Commonwealth*, 205 Va. 528, 532 (1964). The intent to steal is the intent to permanently deprive the owner of property. *Id.* at 533. "The fact finder 'may infer the felonious intent from the immediate asportation and conversion of the property, in the absence of satisfactory countervailing evidence . . . .'" *Clay v. Commonwealth*, 30 Va. App. 254, 261 (1999) (en banc) (quoting *Pierce*, 205 Va. at 533). "Intent may, and most often must, be proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts are within the province of the trier of fact." *Fleming v. Commonwealth*, 13 Va. App. 349, 353 (1991).

Viewed in the light most favorable to the Commonwealth, the evidence showed that Roberts intended to steal mother's phone. She testified that when Roberts burst into her bedroom, he immediately grabbed her phone and moved it out of her reach. He then moved her to the living room, where he used her phone to call wife while repeatedly threatening to kill mother. As evidence that he did not intend to steal mother's phone, Roberts notes that he took it a few days earlier to call wife before returning it. But that does not prove that he lacked the intent to steal the phone on the day of the offense. "The mere possibility that the accused might have had another purpose than that found by the fact finder is insufficient to reverse a conviction on appeal." *Hancock v. Commonwealth*, 12 Va. App. 774, 782-83 (1991). The jury could infer from the Commonwealth's evidence, including Roberts's repeated threats to kill mother, that he intended to permanently deprive her of the phone.

We also reject Roberts's argument that he could not "steal" the phone because he had a "bona fide claim of right to" to possess it. Roberts asserts that he had paid for the phone. But taken in the light most favorable to the Commonwealth, the evidence belied that claim. Wife testified without contradiction that she had given the phone to mother and did not intend to take it back. Wife added that she and Roberts jointly paid the phone bill. The jury could properly find that wife gifted the phone to mother and that Roberts did not have a claim of right to possess it. So the trial court was not "plainly wrong" to deny his motion to strike the evidence supporting the robbery charge.

*Abduction*

A defendant is guilty of abduction when he "detains his victim by keeping [her] in a specific place 'through the use of force, intimidation, or deception.'" *Brown v. Commonwealth*, 74 Va. App. 721, 731 (2022) (quoting *Herring*, 288 Va. at 74). The defendant must have the

specific intent to deprive the victim of liberty. *Id.* An abduction occurs even if the victim is detained for only "the briefest of moments." *Id.* at 733.

The record contains ample evidence from which the jury could find that Roberts detained his mother-in-law with the specific intent to take away her liberty. When he burst into her bedroom, Roberts disengaged the controls on mother's motorized wheelchair, preventing her from controlling it on her own. Roberts then wheeled mother into the living room against her will and locked the wheelchair in place, all the while threatening to kill her. And when the police arrived, Roberts moved mother into the kitchen, holding the knife to her throat and grabbing her hair. The jury could thus conclude that Roberts detained his mother-in-law "in a specific place 'through the use of force [or] intimidation.'" *Id.* at 731 (quoting *Herring*, 288 Va. at 74).

CONCLUSION

We find no basis to disturb the judgment.

*Affirmed.*